Roger D. LAWSON, Francis E. Lawson, Peggy I. Lawson, and Beverly J. Lawson, Plaintiffs-Appellants,

v.

SCHUMACHER & BLUM CHEVROLET, INC., and General Motors Corporation, Defendants-Respondents.

No. 13363.

Missouri Court of Appeals, Southern District, Division One.

March 19, 1985.

Loren R. Honecker, Sherwood, Honecker & Bender, Springfield, Nolen W. Berry, Johnson & Berry, Neosho, for plaintiffs-appellants.

David C. Humphreys, Joplin, for defendant-respondent Schumacher & Blum Chevrolet; Blanchard, Van Fleet, Martin, Robertson & Dermott, Joplin, of counsel.

Rodney E. Loomer, Meredith B. Turner, Turner, Reid, Duncan, Loomer & Patton, P.C., Springfield, for defendant-respondent General Motors Corporation; Patricia S. Harris, Judith A. Zakens, Detroit, Mich., of counsel.

GREENE, Judge.

Plaintiffs, Roger Lawson, Beverly Lawson, Francis Lawson and Peggy Lawson sued defendants, Schumacher & Blum Chevrolet, Inc., and General Motors Corporation, for damages alleging personal injury to Roger, loss of services to his wife, Beverly, and property damage to plaintiffs' tractor truck as a result of a wreck Roger had on November 15, 1977, in a 1976 Chevrolet tractor truck manufactured by General Motors, which plaintiffs had purchased on August 24, 1977, from Schumacher & Blum.

The case was submitted on the theory that a 1976 Chevrolet Titan 90 Royal Custom tractor truck unit was sold to plaintiffs in a defective condition which rendered it unreasonably dangerous for its anticipated use of pulling loaded trailers, and that such defect caused the accident in question. Roger's testimony was that he was driving the truck approximately 45 miles per hour down a hill with a right-hand curve at the bottom on U.S. Highway 65 in Christian County, Missouri, when the steering apparatus went into "a complete lockup" causing him to lose control and, as a result, the truck ran off the left side of the highway and crashed. Lawson testified that he had previously noticed an undefined roughness in the steering from time to time.

Plaintiffs attempted to prove that metal fragments in the hydraulic valve mechanism of the power steering assist unit caused the valve to bind, resulting in failure of the power steering unit to respond to pressure applied by Roger to turn the steering wheel. Roger testified that as he approached the accident scene, he exerted as much pressure as he could on the steering wheel in an attempt to turn the truck to the right, but that the wheel broke loose from his hands and spun rapidly, causing the truck to lurch sharply, leave the road and finally crash into a rock bluff on the left side of the highway, seriously injuring him. The jury found for defendants, and the plaintiffs appeal.

On appeal, plaintiffs raise three evidentiary points as grounds for reversal. Two of these points require some understanding of the steering system involved and of the evidence offered by the parties.

The steering system in question was a mechanical system with a power assist. In the mechanical system, the steering wheel connects through the steering column to a "stub shaft" which engages a worm gear housed in the steering gear box. The latter mechanically transfers movement to a connected Pitman arm and, in turn, to the linkage which directs the wheels.

Working to aid the mechanical steering is a hydraulic power assist system. In this system, a pump driven by a belt from the vehicle's engine causes fluid from a supply cannister to be circulated under pressure through a valve assembly. The valve has a small cylindrical spool or core which is positioned inside a closely fit valve body, also cylindrical in shape. The matching surfaces of these two parts contain longitudinal grooves which relate to one another in the operation of the valve. The stub shaft passes through the common center of these nested cylinders so that it is, in a sense, the common element of the mechanical and hydraulic systems.

The valve assembly is in a housing attached to the upper part of the steering gear box. Although the stub shaft and the worm gear are necessarily connected up as part of the mechanical system, there is a seal between the gear box and attached valve housing which prevents their separate fluid contents from mixing.

The valve components and stub shaft generally turn with the steering wheel and the mechanical steering system. However, the stub shaft also contains a torsion bar device, so that when a turning effort on the steering wheel meets substantial resistance from the road friction, the torsion bar will be twisted. Because of the way the stub shaft engages the valve parts, the twisting allows the valve spool to turn slightly inside the valve body in one direction or the other, depending on which way the operator is turning the steering wheel. Normally, fluid pumped into the valve simply circulates back to the pump because of certain holes found in the valve parts. However, the relative dislocation of the spool in the valve body under turning pressure results in the fluid being diverted by the alignment of the grooves mentioned earlier, so as to pass the fluid through one of two sets of small holes drilled through the valve body, again depending on the direction of the desired turn. These sets of holes or ports channel fluid through hoses going to either side of a double-acting cylinder which is mounted directly to the vehicle's steering linkage. Thus, when the diversion of pressurized fluid causes a flow to one side of the cylinder, its forceful movement in response to that flow is transferred to the linkage, greatly assisting the manual steering.

Plaintiffs' theory was that metal particles left from the manufacturing process clogged the holes in the valve assembly causing it to bind, which, in turn, caused the accident in question.

Shortly after the accident, the gear box and hydraulic valve apparatus were removed from the truck and delivered to Dr. Henry Hicks, an engineering professor at the University of Arkansas. His testimony, to the extent admitted, was presented by deposition. His inspection disclosed no particles in the valve assembly, but he did find some in the mechanical gear box. The latter discovery was not admitted in evidence because not relevant in view of plaintiffs' theory of the case (particles jamming the valve), because the contents of the two assemblies do not communicate during operation.

Later, the power steering pump and hoses were removed from the wrecked truck and, along with the parts seen by Hicks, submitted to Dr. Donald Gibson, a professor of engineering at the University of Missouri. His opinions became the basis for the submission of plaintiffs' case. In early 1981, Gibson disassembled the Titan 90's pump and fluid cannister. He found some particles, metallic and some other types, in the recesses of the container, and

discovered additional particles on a magnet which is factory-installed in the pump to catch and hold furrous material which may find its way into the hydraulic fluid. These particles were described as gray cast iron, consistent with castings used in the steering system. They were not "wear particles," but apparently remained in the cylinder after the manufacturing process.

In answer to a hypothetical question, Gibson opined that the temporary lockup related by Lawson was caused when the valve spool was bound by a particle trapped between the flutes of the valve body and spool. It is important to understand that plaintiffs' theory, as developed by Dr. Gibson, was not merely one of loss of power assist from the particle entrapment. Although Gibson recognized that the mechanical steering system would remain operable in the event of a general failure of the power assist system, it was his belief that a particle trapped, as he described, would also effectively block the mechanical ability to steer until the particle sheared. Gibson believed that fluid in the hydraulic assist cylinder fastened to the steering linkage was not free to drain back through the jammed valve. If he was correct in his belief, a hydraulic blockage would be created, thus making the assist cylinder an effective brake on mechanical movement of the linkage.

William Hubble, a mechanic, also testified for plaintiffs. He performed an experiment in which the Lawson steering gear and hydraulic valve assembly were installed on a rented truck similar to that of the Titan 90. The hydraulic pump was not included in the test so that fluid was pumped into the valve from the test vehicle's own cannister and pump and through its own hoses.

Because a motion in limine was sustained as to any substances Hubble discovered after the test, these findings were included in the record as an offer of proof outside the presence of the jury. Hubble found some "metal shavings" in the gear box, and in the hydraulic valve housing and valve spool. These particles were indis-criminately mixed in a plastic bag as plaintiffs' Exhibit 17. At the conclusion of the offer, the court again ruled Exhibit 17 inadmissible, stating there was no way to know whether the particles originated with the wrecked or the test vehicle.

The primary witness for the defense was Don Deford, an engineer at General Motors Institute of Engineering and Technology and had worked 36 years with the Saginaw Steering Gear Division of General Motors, mostly in the design of products, including steering components. Deford gave a thorough explanation and demonstration of how the mechanical steering and power assist work on trucks like the Titan 90. A major disagreement with plaintiffs' hydraulic lockup theory became apparent as Deford strongly emphasized that it was not possible for the valve spool to jam in the valve body so that fluid would be blocked in the assist cylinder without a way to flow out.

Deford also testified to a complete examination and testing of the steering components from the Lawson truck, and he reported finding nothing to suggest a failure. Part of this testing included installation of the pump, gear, hydraulic valve and cylinder on a similar truck which he road tested with no sign of difficulty.

Another experiment conducted by Deford was videotaped and shown to the jury over the objection of plaintiffs. A truck of the same type as the wrecked one was utilized, and a concoction of 750 mg. of gray iron and malleable iron chips and filings, hardened steel chips, slivers of Teflon, and core sand was placed in its hydraulic steering fluid along with some used oil containing scrapings from a "high mileage magnet." The tape showed Deford putting the truck through some difficult turning, during which he noticed two or three "nibbles," and through a road test with no difficulty. Apparently, at the time of trial, the truck with the contaminated fluid continued to be used by Saginaw Steering as a fleet vehicle, pulling trailers, with no further alterations to the steering system.

Deford also testified that the rotating valve type power steering units are designed to tolerate wear and other particles which can be expected to occur in the system even if not caught by the magnet installed near the pump. This was emphasized by showing that any particle caught between the valve spool and body would be subject, by principles of physical leverage, to a force more than 18 times that exerted on the steering wheel. In this respect, the system digests, by shearing, any particles which might be so situated. In Deford's opinion, the steering mechanism had nothing to do with the wreck, because no particle small enough to get into the valve could cause it to jam, nor cause a hydraulic block.

Plaintiffs' first point relied on is that the court erred in excluding evidence of the various particles found by Hicks in the gear box, and those found by mechanic Hubble (Exhibit 17), after his examination and testing using uncleaned components from another truck. They urge that this evidence is relevant to the issue of the existence of at least one particle in the hydraulic valve at the time of the mishap.

 Evidence in the form of an offered fact is relevant if it tends to prove or disprove a fact in issue, or corroborates evidence which is relevant and which bears on the principal issue. *Arie v. Intertherm, Inc.,* 648 S.W.2d 142, 154[16] (Mo.App. 1983). Relevancy is that relationship between the offered fact and fact in issue to such a degree that the truth of the offered fact makes probable the existence of the fact in issue. *McIlroy v. Hamilton,* 539 S.W.2d 669, 676[10] (Mo.App.1976). The determination is often subjective. For that reason, a trial court has substantial discretion in ruling on the admissibility of evidence. *Karashin v. Haggard Hauling & Rigging, Inc.,* 653 S.W.2d 203, 205[3] (Mo. banc 1983); *Gant v. Hanks,* 614 S.W.2d 740, 744[3] (Mo.App.1981). Thus, the admission or exclusion of questionable evidence is committed to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Moreland v. State Farm Fire and Casual-*

*ty Co.,* 662 S.W.2d 556, 565[16, 17] (Mo. App.1983); *Lawson v. Cooper,* 475 S.W.2d 442, 447 (Mo.App.1972).

 These principles are fully applicable to the case before us, and we find no abuse of discretion in excluding evidence of the particles found by Hicks and Hubble. What we have in each case is a secondary relationship, at best, to a fact in issue, so that the probability of the latter was not necessarily enhanced by the proffered evidence. *Moreland,* supra, 662 S.W.2d at 565; *City of Cape Girardeau v. Robertson,* 615 S.W.2d 526, 531 (Mo.App.1981). We fail to see how the presence of particles in a separate component lends logical impetus to the conclusion plaintiffs asked the jury to reach. They argue that because the gear box was subject generally to the same manufacturing conditions and processes, the particles found show a tendency which renders particles in the valve more probable. There is some circumstantial appeal to this argument, but we are not prepared to say the trial court abused the considerable discretion it had in the matter. This is especially so in view of the fact that there was never a doubt that particles might exist in the system, and that such were even to be anticipated.

The particles found by Hubble in the valve parts, after a hookup to the pump and related parts of another truck, have no discernible probative significance other than to show it possible for particles to get there. Again, that was not really denied; the issues were whether such particles could jam the valve and create a lockup of the steering. The jury could infer from the testimony of Gibson that some particles were in the system at the time of the accident and did have the capability of reaching the valve area. The wholly speculative matter of the Hubble particles was collateral to the real issues, not relevant and possessed of a tendency to mislead. *See Jones v. Terminal R.R. Ass'n. of St. Louis,* 242 S.W.2d 473, 477 (Mo.1951). Plaintiffs' first point is denied.

Plaintiffs next allege that the trial court erred in allowing in evidence that portion

of the accident report prepared by the investigating officer, Trooper Sam Kaunley, called as a witness by General Motors, which stated "speed too fast for conditions."

Kaunley had worked the accident in question well over five years prior to the time of trial. He recalled that the accident occurred at a place called the "S–Curve," and in fact in the "first curve in the S." Several accidents have occurred in this area, which is at the end of a long hill sloping downward in the direction the truck was going. The trooper testified, without objection, that his report did not reflect any debris prior to the point of impact with a rock wall, nor was there any indication of skidmarks, which features would have been noted if present.

When counsel for General Motors asked if there was any evidence to indicate that Roger Lawson took evasive action, plaintiffs interposed an objection. Counsel for General Motors then attempted to lay a foundation for use of the trooper's written report as a business record. However, before the court could rule, plaintiffs' counsel insisted on some voir dire questions, which he concluded by volunteering that the report could be admitted as representing the "past recollection recorded" of the trooper. The court promptly announced the report admitted, and direct examination briefly resumed.

Upon further objection by plaintiffs' counsel, based on the fact the witness then appeared to be testifying from refreshed recollection, in which event "he can't testify from that document," the court made it clear it thought the business records exemption covered the matter. Counsel immediately protested: "Wait a minute, if we are talking about business records, I want to object to it on hearsay, that it has hearsay and conclusions in it." In the ensuing colloquy, it became clear that the real object of plaintiffs' concern was a notation in the report: "speed too fast for the conditions." Although counsel made various references to hearsay, the more thoroughly explained ground of objection was that a

purported expert conclusion was involved, and the trooper had not been qualified as an expert in "accident reconstruction." The absence of certain physical evidence at the scene, it was stated, does not establish speed. It was also complained that the conclusion "invades the province of the jury."

Following the overruling of these objections, General Motors' counsel proceeded to once again question the witness as to the lack, at the scene, of any physical signs, such as scuff marks, signs of rubber or other debris, which would have been consistent with Roger Lawson's testimony about how his wheels turned sharply right and the tractor violently continued off the left of the road into the rock wall. Plaintiffs' last overruled objection "for the purpose of the record," just before this testimony, was to "continue to object to this witness giving testimony which calls for an expertise which he has not been qualified to give." The judge pointedly responded that he thought the witness was "qualified for accident investigation." The trooper was then allowed to say again that, according to his report, there was no evidence of scuff marks, rubber residue or debris prior to the point of impact.

The report was then passed to the jury. Thereafter, plaintiffs' counsel cross-examined the trooper at some length about his investigation. At the conclusion of this examination, "the box marked speed" was mentioned for the first time in the presence of the jury as counsel for the plaintiffs elicited the acknowledgement that the trooper did not recall why he had included the speed notation.

On appeal, plaintiffs claim the trooper's report should not have been admitted in toto, and that the notation about speed and conditions should have been excluded. The specific ground now assigned is that the officer was not competent to reach "such a conclusion with respect to a subject exclusively within the providence (sic) of the jury." The point as framed, and the arguments made in support, leaves some uncertainty as to whether the complaint is that

the trooper was not shown to be qualified to have made the conclusory remark, *Cebula v. Benoit*, 652 S.W.2d 304, 309 (Mo.App. 1983), or that the subject matter is not one appropriate for the special qualification of an expert. *Hamre v. Conger*, 357 Mo. 497, 507, 209 S.W.2d 242, 249 (1948). In any event, plaintiffs recognize they have a preservation problem, but note that they did begin to object before the report was shown to the jury.

■ We can hardly ignore the express consent by plaintiffs' attorney, without reservation, that the document could be admitted in evidence, a tender which the court promptly obliged by admitting the report. It is only reasonable that having expressly consented to an item being admitted in evidence, there is no standing to complain later about the matter, in whole or in part. Where a documentary exhibit is admitted, then generally the whole of its contents is in evidence. *Ellis v. Farmer*, 287 S.W.2d 840, 844[5] (Mo.1956). Thus, where a party concedes the admission of such an exhibit without specific objection or reservation as to a part not then read to the jury, a later objection will be unavailing. *See Skelton v. General Candy Co.*, 539 S.W.2d 605, 613–614 (Mo.App.1976); *State v. Martin*, 616 S.W.2d 80, 81 (Mo.App.1981). This is especially true where the contents have been previously available to counsel so that he should have been sufficiently informed of possibly objectionable material. *See State v. Foster*, 501 S.W.2d 33, 36 (Mo. 1973).

■ It should also be emphasized that neither speed, nor any aspect of Roger Lawson's conduct, was at issue in the case. Contributory negligence, as historically understood, is not a defense in a strict liability case. *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362, 365 (Mo. 1969). However, it is true that conduct of the user may become a superseding cause of damages in a products liability action. Such conduct may be grounded on misuse of the product and use while knowing of a defect. Prosser and Keeton on The Law of Torts § 102 (W. Keeton 5th ed. 1984). The latter, known in Missouri law as contributory fault, is an affirmative defense and was not submitted in this case. *Means v. Sears, Roebuck & Co.*, 550 S.W.2d 780, 787 n. 6 (Mo. banc 1977); MAI 32.23 [1978 Revision]. The former was adopted into Missouri law as an affirmative part of a plaintiff's case. *Keener*, supra, 445 S.W.2d at 365–366. Thus the verdict directors correctly submitted the proposition that "the truck was used in a manner reasonably anticipated." MAI 25.04 [1978 Revision].

■ Roger Lawson's testimony was sufficient to submit that he was using the truck in a manner reasonably to be anticipated. No converse of this was offered. It is clear that the trooper's testimony was offered to show that the physical facts were inconsistent with Roger Lawson's account of how the steering locked then broke loose in a manner to violently pitch the cab and force the truck across the road to the point of impact. It was plaintiffs' own counsel who emphasized the speed notation. In doing so, it was made quite clear to the jury that the trooper had no actual knowledge of the speed, that he did not know upon what basis he made the entry and that no speed citation was issued. Thus, the speed opinion concerned a matter not really at issue and the jury understood the officer could offer no explanation for the conclusion. Admission of the trooper's report was of little consequence, and was not prejudicial, even if the trial court could be said to have erred. *See Le Grand v. U–Drive-It Co.*, 247 S.W.2d 706, 714–715 (Mo.1952). Plaintiffs' second point is denied.

Plaintiffs' third point of alleged error challenges the videotaped experiment shown to the jury during the testimony of Donald Deford. Plaintiffs' objections to the taped experiment were that it did not duplicate the conditions of the wrecked vehicle in that the latter had 17,000 miles on it at the time of the accident while the test truck had 655,000 miles of use, that the Lawson truck was pulling a loaded trailer whereas the test tractor pulled no trailer at all, and that the injected contamination was

not shown to be chemically equivalent to what had been found on the magnet of the wrecked truck. The court held that these differences went to the weight of the evidence, and that the tape was probative on the issue of whether particles in the system is a dangerous defect.

The standards for the admission of experimental evidence were stated in the context of strict liability litigation in *Blevins v. Cushman Motors,* 551 S.W.2d 602, 610 (Mo. banc 1977):

> The law is well settled that experimental evidence is admissible when the experiment was made under conditions substantially similar in essential particulars to the conditions which prevailed at the time of the occurrence in suit, and that the conditions need not be identical. *Faught v. Washam,* 329 S.W.2d 588, 598 (Mo.1959); *Wilcox v. St. Louis-Southwestern Railroad Co.,* 418 S.W.2d 15 (Mo.1967); *Klaesener v. Schnucks Markets, Inc.,* 498 S.W.2d 555, 557 (Mo.1973). The similarities must be in those circumstances or conditions as might supposedly affect the result in question; and the degree of similarity or difference should be judged in the light of the fundamental principle that any fact should be admissible which logically tends to aid the trier in determination of the issue. *Ward v. Penn Mutual Life Insurance Co.,* 352 S.W.2d 413, 425 (Mo.App.1961). In determining this question of sufficient similarity, a substantial measure of discretion must be accorded to the trial judge. *Klaesener v. Schnucks Markets, Inc.,* supra; *Lietz v. Snyder Manufacturing Co.,* 475 S.W.2d 105, 107 (Mo. 1972); *Lynch v. Railway Mail Association,* 375 S.W.2d 216 (Mo.App.1964); *Ward v. Penn Mutual Life Insurance Co.,* supra.

*See also Fowler v. S–H–S Motor Sales Corp.,* 560 S.W.2d 350, 356 (Mo.App.1977).

■ The purpose of the experiment went to the heart of the case, and was designed to show that particles circulating in the power steering system would not produce the disastrous condition plaintiffs' theory supposed. As such, it is difficult to imagine a more appropriate test. Plaintiffs' claimed violation of the rule of substantial similarity has no merit.

■ Certainly, the proponent of experimental evidence has the burden of presenting a foundation showing that the test, in material aspects, has the requisite similarity to the conditions or occurrences at issue in the suit. *Barnes v. General Motors Corp.,* 547 F.2d 275, 277 (5th Cir. 1977). However, substantial similarity is a very flexible concept depending on what conditions it is important to control. McCormick on Evidence § 202, at 601 (E. Cleary 3rd ed. 1984). Variances in conditions which are more detrimental to the proponent of the test than those which existed in the original will not bar admission. *Blevins,* supra, 551 S.W.2d at 609–610. Variances in critical conditions which are unduly favorable to the proponent will require a test to be disallowed. *See Cohen v. Archibald Plumbing & Heating Co.,* 555 S.W.2d 676, 680 (Mo.App.1977).

In a hearing outside the presence of the jury, before the videotape was admitted for showing to the jury, it was established that the test truck was a Titan 90 with the same steering mechanism as the Lawson truck. It was also stated that the concoction introduced into the system, most of which was placed into a hose so it would be certain to circulate through the valve area, contained all the types of particles which might typically be expected to be present. It specifically included both machining chips and filings of gray iron like plaintiffs' expert Gibson testified he found on the magnet of the Lawson vehicle. Deford estimated there was more than 30 times the amount of foreign material placed in the system than appeared on the magnet of the Lawson truck. He acknowledged there would be wear in certain parts of the system of the test truck, such as where the valve assembly rotates in its housing. Although he did not examine those parts, he did not feel that such wear would affect the ability of the valve to handle the particles. He further noted that the effect of a

loaded trailer would be to place more weight on the front wheels, but that the function of the valve mechanism would not be affected. The tape depicted the experiment in a straightforward manner and showed the truck being operated in a variety of situations, including highway driving at a speed of 45 miles per hour. The proponent of the experiment, General Motors, met its foundational burden. There was clearly no abuse of discretion in admitting the taped experiment. The issues raised by plaintiffs are matters of weight, not admissibility.

Plaintiffs had a fair chance to present their theory as to an unreasonably dangerous defect, and the jury was able to fairly weigh the conflicting expert opinions. Nothing in the points raised by plaintiffs constitutes reversible error. The judgment of the trial court is affirmed.

TITUS, P.J., and FLANIGAN, J., concur.