Jeffrey SPAIN, et al., Respondents,

v.

Michael A. BROWN, M.D.,
et al., Appellants.

No. 58469.

Missouri Court of Appeals,
Eastern District,
Division Five.

June 11, 1991.

Robert G. Burridge, Stuart M. Haw, Anderson, Gilbert and Garvin, St. Louis, for appellants.

John A. Kilo, Michael W. Flynn, Michael H. Izsak, Klutho, Cody, Kilo, Flynn, Billingsley & Trame, P.C., St. Louis, for respondents.

AHRENS, Judge.

In this jury-tried medical malpractice case, defendants Dr. Michael Brown, Dr. Jordan Ginsburg, and Jewish Hospital appeal from a judgment in favor of plaintiffs Jeffrey and Jorja Spain. We affirm.

Defendants raise three points on appeal. First, the trial court erred in giving plaintiffs' verdict directing instructions. We disagree, because the instructions did not give the jury a roving commission or permit an inference of negligence from injury; further, the instructions were not argumentative or confusing. Second, the trial court erred in admitting the testimony of two chiropractors and an economic expert on the issue of lost earnings. We disagree, because the testimony was relevant and the trial court did not abuse its discretion. Third, the trial court erred in excluding a videotape depicting two elbow arthroscopies. We disagree, because the videotape

was not relevant and the trial court did not abuse its discretion.

As a high school and college student, plaintiff[1] sustained three hyperextension injuries to his right elbow. Each injury was treated non-surgically. When plaintiff was a student at a chiropractic college, his right elbow occasionally locked and was painful when he performed chiropractic manipulations.

In January, 1985, plaintiff sought medical treatment for his elbow condition at Jewish Hospital Orthopedic Clinic, where he was seen by defendant Dr. Michael Brown, an orthopedic resident in his fourth postgraduate year. After arthrograms of the elbow were taken, Dr. Brown diagnosed the condition as being caused by a bone chip in plaintiff's elbow.

Dr. Brown and plaintiff discussed possible treatments, including arthrotomy, which involves opening the elbow joint, and arthroscopy, which involves viewing the elbow joint through a fiberoptic device inserted through a small portal incision. Based on Dr. Brown's description of the two procedures, plaintiff elected to undergo arthroscopy.

On March 11, 1985, while plaintiff was being prepared for surgery, Dr. Brown gave plaintiff a consent form and, for the first time, informed plaintiff that arthroscopy involves risks of infection, anesthesia risks, and a risk of danger to blood vessels and the ulnar nerve. Dr. Brown did not inform plaintiff that an elbow arthroscopy also involves risks of nerve severance and paralysis.

Defendant Dr. Jordan Ginsburg, an orthopedic surgeon and assistant clinical professor, supervised and assisted Dr. Brown in the arthroscopy. Dr. Brown or Dr. Ginsburg made portal incisions on the medial and lateral sides of plaintiff's right elbow, but no bone chip was found.

Following the arthroscopy, plaintiff's right wrist was completely paralyzed; he was unable to raise or extend the thumb and fingers on his right hand. Exploratory

[1]. To facilitate the discussion of the facts and issues, we use the singular form of plaintiff in reference to Jeffrey Spain, because Jorja Spain's claim is derivative of his claim.

surgery revealed plaintiff's right radial nerve was in the normal anatomical location; the nerve was partially divided directly underneath the scar from the lateral portal incision made during the arthroscopy.

During the first year after the arthroscopy, plaintiff experienced some nerve regeneration which enabled him to raise his right wrist. He did not, however, regain the ability to raise or extend the thumb and fingers of his right hand.

Upon graduation from chiropractic college, plaintiff received chiropractic licenses in three states and began teaching at a chiropractic college. In May, 1987, plaintiff purchased an established part-time chiropractic practice in Valentine, Nebraska. In July, 1989, plaintiff sold the practice and took a job with a pharmaceutical company because his right hand had weakened and the pain in his right elbow had become intense, making it difficult for him to perform chiropractic manipulations.

At the conclusion of the evidence, the jury returned a verdict in favor of plaintiff Jeffrey Spain and against all defendants, assessing damages at $1,750,000. The jury awarded plaintiff Jorja Spain $50,000 on her loss of consortium claim.

## I. Verdict Directors

In their first point, defendants allege the trial court erred in giving plaintiffs' verdict directing instructions 8, 10, 12, 16, 18 and 20. Instruction 8 reads:

> Your verdict must be for the Plaintiff, Dr. Jeffrey Spain, against Defendant Michael A. Brown, M.D., if you believe:
> First, either:
> Defendant Michael A. Brown, M.D., while performing arthroscopic surgery on Plaintiff's right elbow, placed the lateral portal at the wrong location in relation to the anatomical landmarks of Plaintiff's elbow, or
> Defendant Michael A. Brown, M.D. failed to advise Plaintiff of the risk of permanent loss of function to either his right arm, wrist or hand from the elbow arthroscopy surgery, and

> Second, Defendant Michael A. Brown, M.D., in one or more of the respects submitted in paragraph First, was thereby negligent, and
> Third, such negligence either directly caused damaged [sic] to Plaintiff Dr. Jeffrey Spain or combined with the acts of Defendant Ginsburg to directly cause damage to Plaintiff Dr. Jeffrey Spain.

Instruction 10 is directed to plaintiff's claim against Dr. Ginsburg. It provides, in part:

> Your verdict must be for the Plaintiff, Dr. Jeffrey Spain, against Defendant Jordan H. Ginsburg, M.D., if you believe:
> First, either:
> Defendant Jordan H. Ginsburg, M.D., while performing arthroscopic surgery on Plaintiff's right elbow, placed the lateral portal at the wrong location in relation to the anatomical landmarks of Plaintiff's elbow, or
> Defendant Jordan H. Ginsburg, M.D., failed to supervise Defendant Brown's placement of the lateral portal so that the lateral portal would be at the correct location in relation to the anatomical landmarks of Plaintiff's elbow, * * *

Instruction 12 incorporates paragraphs First of instructions 8 and 10, and submits plaintiff Jeffrey Spain's claim against defendant Jewish Hospital. Instructions 16, 18 and 20 submit plaintiff Jorja Spain's derivative claims against the three defendants, and are otherwise substantially similar to instructions 8, 10 and 12, respectively.

Defendants attack these instructions as giving the jury a roving commission; allowing the jury to infer negligence from the fact of injury; and being argumentative and confusing. Defendants further contend the evidence did not support submitting the disjunctive portion of paragraph First in instructions 8, 12, 16, and 20 relating to Dr. Brown's failure to advise plaintiff there was a risk of loss of function.

### A. Roving Commission and Inference of Negligence from the Fact of Injury

The challenged verdict directors were modified versions of MAI 21.01. While

MAI 21.01 requires the "act or omission complained of" to be set out in paragraph First of the instruction, Rule 70.02(e) mandates that modifications to an MAI "shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts."

Accordingly, "[a] proper instruction submits to the jury only ultimate issues, not evidentiary details, in order to avoid undue emphasis of certain evidence, confusion, and the danger of favoring one party over another." *Schiles v. Schaefer,* 710 S.W.2d 254, 265 (Mo.App.1986). Our courts, however, "have been unable to fashion precise, universally applicable definitions which explicitly differentiate evidentiary facts from ultimate facts and, thus, on a case by case basis, we determine 'what [are ultimate facts] which must be submitted in a verdict directing instruction and what are evidentiary facts which, in detailed fashion, are not to be included ...'." *Id.* (quoting *Grindstaff v. Tygett,* 655 S.W.2d 70, 73 (Mo.App.1983)).

Defendants allege the verdict directors erroneously included the word "wrong." They assert "plaintiffs' case hung on the testimony of Dr. Ronald Greene. The thrust of his presentation was that defendants' negligence lay in their failure to measure or use a rule or measuring device in determining where to place the lateral incision[.]" Therefore, defendants maintain, the court should have instructed the jury by describing "that location in meaningful but non pejorative terms and then ask the jury to derive negligence from the location thus determined."

It is apparent from the record that the location of plaintiff's lateral portal incision scar and the proper location of that incision, in Dr. Greene's opinion, was aptly demonstrated for the jury by Dr. Greene's use of anatomical models and a photograph of plaintiff's elbow. According to Dr. Greene, the proper location of that incision could be found by measuring, in millimeters, from specific anatomical landmarks. While, in Dr. Greene's opinion, the "failure to measure was the absolute one hundred

percent cause" of the partial severance of plaintiff's right radial nerve, he also stated defendant doctors were "not even in the ballpark with that incision."

Further, the basis of his opinion that Dr. Ginsburg failed to use the normal standard of skill was that the "portal incision is in the entire wrong place." Dr. Greene's testimony is replete with such references to the incision being in the "wrong" location.

Defendant Dr. Ginsburg acknowledged the risk of an elbow arthroscopy "lies on where the three millimeter incision is made." According to defendants' expert Dr. William Skimming, measuring and marking anatomical landmarks to determine the location of the incision is "frequently mentioned as a technique to do"; although "the measuring is a little more crude than actually using a tape measure." According to Dr. Skimming, there is some anatomical variation in the location of the radial nerve, but he generally considers "the nerve being about ... three of my finger widths above the lateral epicondyle" or "about an inch and a half."

Defendants suggest the court should have instructed the jury using the phrases, "four centimeters distal from the lateral epicondyle," or "two finger widths down from the bony knob." To have submitted such verdict directors would have required the jury to make detailed evidentiary findings which are precluded under MAI.

Defendants rely on *Grindstaff,* 655 S.W.2d 70, in support of their assertion the instructions granted a roving commission. The verdict director in *Grindstaff* requested the jury to determine whether "defendant performed a midforceps rotation delivery when such procedure was not medically proper." *Id.* at 72. The *Grindstaff* court held the phrase "not medically proper" did "not submit the ultimate facts which define for the jury plaintiffs' specific theory of negligence," and the phrase gave "the jury no factual guideline or standard to determine negligence." *Id.* at 73. The *Grindstaff* court concluded that based on the experts' testimony defining the conditions under which a midforceps rotation is proper and those under which it is improper,

plaintiffs' generalized theory in the instruction contained "at least two more specific theories of negligence." *Id.*

■ In contrast, the verdict directors in the present case submitted plaintiffs' specific theory that, as asserted by their expert, the lateral portal was made in the wrong location with respect to the anatomical landmarks. *Grindstaff* is not controlling.

Support for the challenged verdict directors is found in *Wilson v. Lockwood*, 711 S.W.2d 545 (Mo.App.1986). There, the court examined an instruction adapted from MAI 21.01 in a medical malpractice case involving the circumcision of an infant. Paragraph First of the verdict director asked the jury to determine if the defendant physician "[s]elected the wrong size of plastibell circumcision device or positioned or applied the said device improperly on the minor plaintiff's penis at the time of circumcision." *Id.* at 553. The *Wilson* court held the instruction tracked the testimony of the plaintiffs' expert and, thus, did not grant the jury a roving commission. *Id.*

As in *Wilson*, the verdict directors in the present case tracked the testimony of Dr. Greene and submitted the plaintiffs' specific theories of negligence against each defendant. The verdict directors made it clear to the jury what facts it was required to find in order to return verdicts against defendants. Accordingly, the verdict directors did not grant the jury a roving commission.

■ Further, contrary to defendants' assertion, the challenged instructions did not permit the jury to "infer negligence from the fact of injury." Defendants argue there "was no controversy as to where the lateral portal was placed" and "the instructions, in effect, told the jurors that they must find for plaintiff if they first find that defendants cut plaintiff's radial nerve and

second find that defendants were thereby negligent."

Defendants oversimplify the jury's task. The jury heard conflicting evidence from plaintiffs' and defendants' experts regarding the distance of the radial nerve from anatomical landmarks and whether that location varies from individual to individual. If the jury had believed defendants' experts, it could have found under paragraph First that the lateral portal was not placed in the wrong location with respect to the anatomical landmarks, even though the radial nerve was partially severed.

If the jury determined the lateral portal was placed in the wrong location with respect to the anatomical landmarks, the jury was required to determine whether defendants were thereby negligent.[2] Again, the jury heard conflicting opinions from the experts. Dr. Greene stated defendants' performance "fell below the standards that were established for orthopedic surgeons in similar circumstances." Dr. Skimming, however, found "no deviation" from any recognized standard of care and no "problem" with defendants' performance of the surgery.

If the jury had believed defendants' evidence, the challenged instructions permitted a finding that regardless of the fact the nerve was partially severed, defendants were not negligent, as that term is defined by MAI 11.06. Therefore, the instructions did not permit an inference of negligence from the fact of injury.

## B. Argumentative

■ Defendants challenge the instructions as argumentative because, "Asking the jury whether an incision made at the wrong spot was negligently made is equivalent to asking the jury whether a negligently made incision was negligently made." We disagree; the verdict directors permitted the jury to find defendants were not negligent even though it believed the

2. The complete set of instructions submitted to the jury were not included in the record. We assume the terms "negligent" and "negligence" were defined for the jury by MAI 11.06 as required by Notes on Use to MAI 21.01: "negli-

gent" and "negligence" are defined as "the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of the defendant's profession."

portal incision was placed in the wrong location in relation to the anatomical landmarks.

Defendants' reliance on *Yoos v. Jewish Hosp.*, 645 S.W.2d 177 (Mo.App.1982) is misplaced. In *Yoos*, paragraph First of the verdict director requested the jury to determine if "defendant's employee administered a spinal anesthetic which was permitted to spread too high to the nipple line." *Id.* at 192. The defendant in *Yoos* contended the verdict director was argumentative, an illegal comment on the evidence, and an illegal assumption of a controversial fact in violation of MAI. *Id.* The *Yoos* court agreed the instruction was an unwarranted comment on the evidence. *Id.* The *Yoos* court was concerned "[s]ome jurors of ordinary intelligence could reasonably interpret paragraph FIRST as requiring only a finding that the spinal reached the nipple line. With this finding these jurors would understand the nipple line as being already defined, as a matter of law, as 'too high.' ". *Id.*

In contrast, the verdict directors in the present case asked the jury to determine if the lateral portal was in the wrong location *in relation to the anatomical landmarks.* Nothing in the verdict directors would lead a juror of ordinary intelligence to understand the location of the actual portal incision had already been defined as a matter of law as being "wrong." Moreover, contrary to defendants' assertion, the verdict directors would not lead such a juror to interpret the instructions as requiring only a finding that the radial nerve had been cut. The challenged verdict directors were not argumentative.

### C. Confusing as to Theory of Negligence

■ Defendants assert the verdict directors were confusing as to plaintiffs' theory of negligence, because plaintiffs' theory at trial was defendants' failure to measure. Defendants argue they used the "Lanny Johnson" technique in performing the arthroscopy and this technique did not require that measurements be made.

The instructions, however, tracked plaintiffs' expert's testimony and submitted plaintiffs' theory that the lateral portal incision was placed in the wrong location with respect to the anatomical landmarks. We do not find the instructions confusing as to this theory of negligence.

### D. Submissibility of Failure to Warn Plaintiff

■ Defendants allege the alternative submission in paragraph First of instructions 8, 12, 16, and 20 regarding Defendant Dr. Brown's failure to advise plaintiff there was a risk of permanent loss of function to his right arm, wrist, or hand was not supported by the evidence. Defendant's allegation is without merit.

Defendants point out that there was evidence plaintiff, as a chiropractic student, studied the structure of nerves and knew if a nerve was cut it would result in paralysis. "In determining whether an instruction should have been given or withheld based on the evidence presented, we view the evidence in the light most favorable to the party offering the instruction giving the party the benefit of all favorable inferences and disregarding the contrary evidence." *Edgewater Health Care v. Health Systems*, 752 S.W.2d 860, 868 (Mo.App.1988). While Dr. Brown advised plaintiff the arthroscopy involved a risk of nerve "damage", Dr. Brown admitted he did not advise plaintiff there was a risk nerves would be cut or severed. Further, Dr. Brown admitted he did not advise plaintiff the risk of nerve damage included the risk of permanent paralysis or permanent loss of function.

Viewing the evidence in the light most favorable to plaintiffs, there was sufficient evidence to support submitting this issue to the jury.

Point one is denied.

### II. Expert Testimony

In their second point, defendants allege the trial court erred in admitting the testimony of Drs. Thomas Greene and Walter Conard regarding their earnings as chiropractors in Lincoln, Nebraska. Defendants

also allege the opinion testimony of Dr. Leroy Grossman, plaintiff's economic expert, based on those earnings was irrelevant and inadmissible.

Dr. Thomas Greene and plaintiff are near in age. Both were raised in Valentine, Nebraska and attended the same chiropractic college. Dr. Greene had been practicing chiropractic medicine since 1984. Dr. Conard had practiced for approximately 15 years and had established the Valentine, Nebraska practice which he later sold to plaintiff.

Because plaintiff did not have an established practice, Dr. Grossman found it necessary "to compare him to somebody else, and we've got a range of other people. Someone who's very similar in background to him, someone who is in the area but established, and then we have an average." As an economist, Dr. Grossman believed it was reasonable to use the earnings of Drs. Thomas Greene and Conard for comparison purposes.

Dr. Grossman calculated plaintiff's lost earnings, comparing plaintiff's earnings to each chiropractor's 1986–1988 earnings, and to an average of those earnings. In Dr. Grossman's opinion, the present value of plaintiff's lost earnings was between $2,650,772 and $3,876,860.

Defendants objected to Dr. Grossman's opinion testimony as not "representative," not a "fair assumption," "without foundation," and requiring "the witness to speculate and conjecture [sic] as to his figures." The trial court overruled the objection, specifically noting the similarities among plaintiff, Dr. Thomas Greene and Dr. Conrad for purposes of Dr. Grossman's comparison.

Defendants' economic experts challenged Dr. Grossman's use of the chiropractors' incomes as a base for his calculations. They calculated the present value of plaintiff's lost earnings to be $125,000 to $290,000, based on the mean and median 1988 earnings of chiropractors as reported by the American Chiropractic Association. Dr. Grossman questioned using those figures as a base because, he asserted, they were from potentially unreliable and distorted survey results, and did not reflect regional variations in chiropractors' incomes.

Defendants cite a line of Oregon cases to support their argument that the expert testimony should have been excluded. We find it unnecessary to address this point pursuant to Oregon law, because the law in Missouri on the admissibility of such testimony is controlling.

"[T]he admission or exclusion of expert opinion testimony is a matter largely within the discretion of the trial court and exercise of that discretion will not be interfered with unless it plainly appears that such has been abused." *Maples v. Charles Burt Realtor, Inc.*, 690 S.W.2d 202, 213 (Mo. App.1985). "The facts upon which an expert's opinion is based, like the facts sufficient to support a verdict, must measure up to the legal requirements of substantiality and probative force; and the question of whether such opinion is based on and supported by sufficient facts or evidence to sustain the same is a question of law for the court." *Vosevich v. Doro, Ltd.*, 536 S.W.2d 752, 760 (Mo.App.1976). Further, § 490.065.3 RSMo provides:

> The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

As noted, there was conflicting testimony from the economic experts regarding the type of data upon which such experts reasonably rely in forming their opinions. In light of plaintiff's testimony that he had intended to establish a practice in a metropolitan area such as Lincoln, Nebraska, the earnings of the two Lincoln, Nebraska chiropractors were relevant for comparison purposes. Although defendants assert Drs. Thomas Greene and Conard may have represented the two highest earning chiropractors in Lincoln, Nebraska, defendants presented no evidence to support this position. In any event defendants

effectively cross-examined Dr. Grossman on that matter. Any dissimilarities in earnings potential went to the weight of the evidence, not to its admissibility. *See State ex rel. Missouri Highway and Transportation Comm'n v. Roth*, 687 S.W.2d 662, 666 (Mo.App.1985). It is apparent from the amount of the total verdict in favor of plaintiff that the jury gave due weight to the economic experts' testimony on the issue of lost earnings.

We find no abuse of the trial court's discretion in admitting Dr. Grossman's opinion testimony and the chiropractors' testimony on which it was based. Point two is denied.

### III. The Videotape

In their third point, defendants allege the trial court erred in excluding a videotape depicting two elbow arthroscopies being performed. We disagree.

Defendants maintained at trial that they performed the elbow arthroscopy on plaintiff's elbow using a technique developed by Dr. Lanny Johnson, an orthopedic surgeon. According to defendants, in preparation for plaintiff's arthroscopy, Dr. Ginsburg loaned Dr. Brown a videotape made in October, 1984, depicting Dr. Johnson performing two elbow arthroscopies using his technique.

Defendants offered the videotape, not "for the truth of what it may contain or the falsity," but to show Dr. Brown's training which, according to defendants, was "very much at issue in this case and in the evidence we had so far." Plaintiffs objected on the grounds the videotape contained hearsay, was irrelevant and immaterial to the issues of the case, and depicted "somewhat dissimilar" elbow arthroscopies performed by a "world renown [sic] expert."

The trial court sustained the objection, stating the videotape "would be offering testimony by the doctor that's not present and not under oath." The trial court, however, informed defendants it was not restricting testimony as to what instructions defendants received.

"The issue to be determined in admitting or rejecting a video tape is whether it is practical, instructive, and calculated to assist the trier of fact in understanding the case." *McPherson Redev. Corp. v. Watkins*, 782 S.W.2d 690, 692 (Mo.App.1989). Great weight is accorded to the trial court's ruling on the admissibility of a videotape, and "that ruling will not be disturbed on appeal absent an abuse of discretion." *Id.* Moreover, "[c]orrect trial court decisions on the admission or exclusion of evidence will not be grounds for reversal because they are based on incorrect reasons." *Roach v. Consolidated Forwarding Co.*, 665 S.W.2d 675, 682 (Mo.App.1984).

■ Defendants argue the videotape was not hearsay because it was offered "to show the information upon which defendants based their procedures while performing the arthroscopy upon plaintiff." In that regard, the videotape was irrelevant.

"Evidence in the form of an offered fact is relevant if it tends to prove or disprove a fact in issue, or corroborates evidence which is relevant and which bears on the principal issue." *Lawson v. Schumacker & Blum Chevrolet, Inc.*, 687 S.W.2d 947, 951 (Mo.App.1985). "Relevancy is that relationship between the offered fact and fact in issue to such a degree that the truth of the offered fact makes probable the existence of the fact in issue." *Id.*

The principal issue was the placement of the lateral portal in relation to anatomical landmarks. The information Dr. Brown received from the videotape was not relevant to that issue unless the videotape was being offered to show Dr. Johnson's opinion of the proper location of the lateral portal incision; that, however, would have constituted hearsay.

Defendants rely on *Goodman v. State Farm Ins. Co.*, 710 S.W.2d 423 (Mo.App. 1986) in which the testimony of an insurance investigator concerning statements made to him by neighbors linking the insured's husband to a fire in the insured's property was properly admitted. The statements were offered, not for their truth, but to establish the information the insurance company possessed when it de-

nied the claim. *Id.* at 424. In that regard, the statements were relevant to the insured's action for vexatious refusal to pay. *Id.* In contrast, the information on the videotape in the present case was not relevant to plaintiffs' medical malpractice claims.

Defendants also rely on *Bailey v. Valtec Hydraulics, Inc.*, 748 S.W.2d 805 (Mo.App. 1988) in which the trial court permitted defendant to show a videotape depicting defendant corporation's employee repairing a hydraulic cylinder similar to one which allegedly injured plaintiff. In *Bailey*, however, the videotape was used during the testimony of defendant's president "as a demonstrative aid to help explain his testimony." *Id.* at 806–807. The appellate court found no abuse of discretion in the admission of the videotape.

Defendants in the present case made no attempt to use the videotape as a demonstrative aid to assist a witness in explaining his or her testimony. *Bailey* is not controlling.

Defendants contend the videotape should have been admitted because plaintiffs' expert, "had belittled the instructional value of this tape and dismissed it as merely an orientation thus disparaging Dr. Brown's preparation for the operation." Defendants' experts, however, refuted those comments and testified the videotape was authoritative and not merely an orientational tool. Whether the videotape is authoritative was not relevant to the issues the jury was asked to decide.

Defendants maintain the videotape should have been admitted because "[t]he general drift of much of the other evidence was such that the jury might have gotten the idea that the defendants fell below the appropriate professional standard simply by using the Lanny Johnson technique instead of the Lynch Casperi technique." The instructions, however, properly guided the jury as to the issues to be determined. While the Lanny Johnson videotape may have aided the jury in understanding the details of the Lanny Johnson elbow arthroscopy technique, its exclusion was not "untenable and clearly against reason" and

did not work an injustice. *See McPherson* 782 S.W.2d at 692.

 Moreover, defendants suffered no prejudice from the exclusion of the videotape. The trial court permitted defendants to describe the Lanny Johnson technique in graphic detail through the use of anatomical models and to present testimony regarding the contents of the videotape. As such, showing the videotape to the jury would have been merely cumulative.

Finding no abuse of discretion or prejudice in the exclusion of the videotape, we deny point three.

The judgment of the trial court is affirmed.

CRANDALL, C.J., and SIMON, J., concur.