Glenna L. GRINDSTAFF and Doyle Grindstaff, Plaintiffs-Respondents,

v.

Joseph N. TYGETT, M.D., Defendant-Appellant.

No. 43774.

Missouri Court of Appeals, Eastern District, Division Four.

June 7, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 15, 1983.

Robert W. Freeman, Freeman, Fredrick, Bennett & Rogers, P.C., Springfield, for defendant-appellant.

Maurice B. Graham, Schnapp, Graham & Reid, Fredericktown, and Kenneth W. Shrum, Marble Hill, for plaintiffs-respondents.

SATZ, Judge.

This is a medical malpractice case. Defendant Dr. Joseph N. Tygett, is a physician, board certified in obstetrics and gynecology. Plaintiffs are Glenna Grindstaff and her husband Doyle Grindstaff. Glenna Grindstaff was an obstetric patient of defendant. She was injured during defendant's delivery of her second child. Glenna

sued defendant for negligently injuring her during the delivery and Doyle sued defendant for loss of consortium. A jury returned a verdict in favor of Glenna Grindstaff for $250,000 and a verdict in favor of Doyle Grindstaff for $25,000.[1] Defendant appeals. We reverse and remand for a new trial.

At 2:00 a.m. on the morning of March 13, 1978, plaintiff was admitted to the labor room at Southeast Missouri Hospital and found to be in active labor. According to the "Nurses Labor and Delivery Record," plaintiff's cervix was dilated 8 centimeters at that time. This dilation meant that plaintiff had not yet reached the second stage of labor.[2] At 2:00 a.m. she was reexamined and still found to be dilated only 8 centimeters. The next entry on the "Nurses Labor and Delivery Record" was at 2:35 a.m. when plaintiff had a "desire to push" and was taken to the delivery room. There is no notation in the "Nurses Labor and Delivery Record" indicating plaintiff ever reached the second stage of labor, i.e., complete or 10 centimeters dilation of the cervix.

According to defendant, he arrived at the hospital between 2:30 a.m. and 3:00 a.m. At that time, he observed that plaintiff was having extremely strong contractions of excellent quality, at two or three minute intervals. According to him, these strong contractions continued until 4:30 a.m. At that time, he determined that, although the baby was coming down the birth canal so that its head had reached the pelvis, the baby's head was not yet in the proper position for delivery. The baby's head was in the left "occiput traverse position." This means the baby was turned on its side with the back of the head towards the mother's left side. Defendant attempted a manual rotation of the child's head but was unsuccessful. At 4:46 a.m., he delivered the baby using a "midforceps rotation" delivery. In this procedure, forceps are used to rotate the baby's head to the proper position and then used to extract the baby. In the hospital delivery record, written and signed by defendant, the method of delivery was described as a "tight midforceps rotation." At a deposition taken on July 5, 1979, defendant described a tight midforceps rotation as being one in which he would have to apply excessive pressure to effect the procedure.

As a result of this forceps delivery, plaintiff sustained a vaginal laceration extending to the cervix and a complete severance of the urethra. Defendant repaired the main part of the vaginal laceration and called in Dr. Terry, a urologist, to repair the severed urethra. As a result of the injury, scar tissue formed and the functional length of plaintiff's urethra was shortened. This, in turn, caused plaintiff to suffer urinary stress incontinence, the involuntary loss of urine.

Defendant complains that plaintiffs' verdict directing instructions were prejudicially erroneous. The verdict directing instruction of plaintiff Glenna Grindstaff, an adaption of MAI 21.01, reads:

"Your verdict must be for the plaintiff Glenna Grindstaff if you believe:

First, defendant performed a midforceps rotation delivery when such procedure was not medically proper, and

Second, defendant was thereby negligent, and

Third, as a direct result of such negligence plaintiff Glenna Grindstaff sustained injuries."[3]

Defendant complains the term "medically proper" is ambiguous, and, thus, gives the jury a "roving commission" to determine

---

1. For convenience we will hereafter refer to the patient Glenna Grindstaff as "plaintiff."

2. As noted in defendant's brief, the three stages of labor are:

"First Stage: From meaningful contractions until complete dilation of the cervix. (10 Centimeters)

Second Stage: From complete dilation of the cervix until delivery of the child.

Third Stage: From delivery of the child to delivery of the placenta (afterbirth)."

3. The verdict directing instruction on the husband's loss of consortium count is essentially the same.

what this phrase means. More specifically, as we understand defendant's complaint, he argues (1) the phrase "medically proper" needed to be legally defined for the jury and (2) the instruction fails to hypothesize facts which made the midforceps rotation delivery not "medically proper." Plaintiffs counter that (1) "not medically proper" is a term of common usage which need not be defined and (2) the instruction includes the ultimate fact issue, namely whether it was medically proper for defendant to perform the midforceps rotation delivery and properly excludes evidentiary facts, such as whether the midforceps rotation delivery was accomplished by the use of excessive force or whether plaintiff Glenna Grindstaff ever entered the second stage of labor, the stage a midforceps rotation delivery is permitted.

■ We agree with defendant's second complaint. The phrase "not medically proper" does not submit the ultimate facts which define for the jury plaintiffs' specific theory of negligence. The MAI are designed to preclude the submission of detailed evidentiary facts and limit the submission only to issues of ultimate fact. *Zipp v. Gasen's Drug Stores, Inc.,* 449 S.W.2d 612, 617 (Mo.1970). An instruction authorizing a verdict, however, must require a finding of *all ultimate facts* necessary to sustain the verdict. *Moore v. Quality Dairy Company,* 425 S.W.2d 261, 266 (Mo.App.1968); *R Way Furniture Company v. Powers Interiors, Inc.,* 456 S.W.2d 632, 639 (Mo.App.1970). "Admittedly, our courts have been unable to fashion precise, universally applicable definitions which explicitly differentiate evidentiary facts from ultimate facts and, thus, on a case by case basis, we determine 'what [are ultimate facts] which must be submitted in a verdict directing instruction and what are evidentiary facts which, in detailed fashion, are

not to be included.' " *L.S. Douglas v. Hoeh,* 595 S.W.2d 434, 438 (Mo.App.1980).

■ As expressed in the verdict directing instructions, plaintiffs' theory of negligence was that defendant performed "a midforceps rotation delivery when such procedure was not medically proper." MAI 21.01, the form malpractice instruction, requires the party to "set out the act or omission complained of."[4] Obviously, plaintiffs do set out defendant's "act" of performing "a midforceps rotation delivery," but requiring the jury to find this procedure was performed when it "was not medically proper" gives the jury no factual guideline or standard to determine negligence. As expressed, plaintiffs' generalized theory of negligence contains at least two more specific theories of negligence: (1) defendant should not have started the procedure, or, (2) starting the procedure was proper but, once started, defendant should have stopped.[5]

The bases for these theories are found in the experts' testimony. The experts defined the conditions under which the procedure of a midforceps rotation delivery is proper and the conditions under which this procedure is improper. Among the prerequisites for performing the procedure are (1) the mother must be in the second stage of labor, or, (2) there is reason to intervene in the natural course of delivery, e.g., evidence that either the mother or infant is in distress, making immediate delivery imperative, or, (3) the procedure can be performed without applying excessive pressure with the forceps.

■ In her brief, plaintiff argues she submitted her case on the theory that the procedure was improper because it was performed at a time and under circumstances "when the rotation of the child's head with forceps could only be effected by the application of excessive force or pressure." The

4. MAI 21.01 gives examples of the acceptable description of the "act or omission complained of." These are: "failed to set plaintiff's broken bones in natural alignment," or "left a sponge in plaintiff's chest after performing an operation," or "failed to administer tetanus antitoxin."

5. Arguably, another theory of negligence encompassed by plaintiffs' submission would be: starting and continuing the procedure was proper, but defendant's technique in performing the procedure was improper.

verdict directing instructions are susceptible to plaintiffs' interpretation. This interpretation, however, is not clearly reflected in the language of those instructions. The phrase "when such procedure was not medically proper" could just as sensibly be interpreted to mean the procedure was improper because it was attempted while the mother was still in the first stage of labor or because there were no signs of infant or maternal distress so that intervention with its attendant risks was not necessary at that time. Thus, plaintiffs failed to submit sufficient ultimate facts so as to make it clear to the jury what facts it must find in order to return a verdict against defendant. As a result, the verdict directing instructions fail to give the jury any real direction; rather, these instructions give the jury a "roving commission" to speculate and determine on its own why and in what manner the midforceps rotation procedure was "not medically proper." *See L.S. Douglas v. Hoeh, supra,* 595 S.W.2d at 437–438. Plaintiffs' verdict directing instructions are, therefore, erroneously misleading. *Id.* at 437–438.

■ "When an erroneous instruction is given and the trial results in favor of the party at whose instance it was given, the presumption is that the error was prejudicial." *Moloney v. Boatmen's Bank,* 288 Mo. 435, 232 S.W. 133, 140 (1921); *Brown v. St. Louis-San Francisco Ry. Co.,* 281 S.W. 452, 455 (Mo.App.1926). More important here, the instructions in question gave the jury a roving commission. Without direction, these instructions were misleading and confusing and, therefore, prejudicial. *E.g., Todd v. Watson,* 501 S.W.2d 48, 49–50 (Mo. 1973); *Dick v. Scott Const. Co.,* 539 S.W.2d 688, 691 (Mo.App.1976). Finding prejudicial error in the verdict directing instructions, we reverse and remand for a new trial.

We now discuss those issues which may come up again on retrial. Plaintiffs' trial attorney posed essentially the same hypothetical question to each of plaintiffs' two expert witnesses. In three separate points on appeal, defendant attacks this hypothetical question. These attacks all center on two basic complaints: (1) the hypothetical question was based primarily on medical records, which were incomplete and the question omitted facts testified to by defendant and (2) the hypothetical question contained contradictory evidence and, thus, required the expert to resolve questions of fact in order to answer the question. We disagree with defendant's first contention but do agree with his second contention.

■ The record reflects that plaintiffs' hypothetical question was based on information included in the hospital records (e.g., Dr. Tygett's record of the delivery procedure as a "tight midforceps rotation") and excluded testimony given by defendant (e.g., Dr. Tygett's testimony that he examined the patient upon his arrival at the hospital and found her cervix to be completely dilated). A hypothetical question, however, need not include all material facts supported by the evidence as long as it includes enough facts to fairly present the questioner's theory. *Hunter v. St. Louis Southwestern Railway Company,* 315 S.W.2d 689, 696 (Mo.1958); *Schmitt v. Pierce,* 344 S.W.2d 120, 130 (Mo. banc 1961). After a careful reading of the record, we conclude the hypothetical question includes all facts necessary to fairly present plaintiffs' possible theories so that the exclusion of other relevant facts does not render the question erroneous.

■ We find, however, the hypothetical to be erroneous because it requires the expert witness to resolve questions of fact. Examples of this required resolutions of fact are set out in the margin.[6] Resolution of a dispute of fact created because of

---

6. For example, the question asks the expert to assume (1) "After what the doctor stated was about a two hour wait, he said it was obvious she couldn't get the baby out and that the baby's head was on the perineum; whereas in his hospital notes he had recorded at the time of delivery that the caput was on the perine- um" and (2) that using Simpson forceps, Dr. Tygett "did a midforceps rotation and delivered the baby at 4:46 a.m., which he states was done without difficulty, though in his written hospital record he states it to have been a tight midforceps rotation."

conflicting evidence is beyond the scope of a hypothetical question. *King v. Gilson,* 206 Mo. 264, 104 S.W. 52, 54–56 (1907). Assumed facts in a hypothetical question must be stated as undisputed facts so the jury can accept or reject the expert's opinion depending on whether the jury finds the assumed facts to be true or false. *Id.* at 54. By requiring the experts to resolve questions of fact, plaintiffs' hypothetical question required the expert to invade the province of the jury, and, therefore, the question was improper.

▮ Because the hypothetical question was improper, defendant argues the experts' answers to the question are without probative value and, therefore, defendant reasons, plaintiff failed to show defendant breached his duty to plaintiff and, thus, failed to make a submissible case.[7] This logic may be sound, but defendant failed to preserve this for appellate review. Objections to hypothetical questions at trial must be specific in order to be preserved for appellate review. *Nagel v. Bi-State Development Agency,* 567 S.W.2d 644, 646 (Mo. banc 1978). At trial, defendant objected twice to what was essentially the same hypothetical question asked of each of plaintiffs' expert witnesses. These objections are set out in the margin.[8] Neither objection is specific enough to preserve this issue for our review. Moreover, for purpose of appeal, defendant's failure to move for a directed verdict at the close of plaintiffs' case or at the close of all the evidence waives his contention that plaintiff failed to make a submissible case. *Frisella v. Reserve Life Insurance Company of Dallas, Texas,* 583 S.W.2d 728, 731 (Mo.App.1979).

This cause is reversed and remanded.

SMITH, P.J., and PUDLOWSKI, J., concur.

---

7. Defendant also uses the asserted defective hypothetical question as a basis for another argument that plaintiff failed to make a submissible case. Defendant correctly notes that so long as a doctor uses the degree of skill and care normally exercised by competent doctors he is not liable for an honest error in judgment. *Williams v. Chamberlain,* 316 S.W.2d 505, 510 (Mo.1958). Since the hypothetical question was defective, defendant argues, the experts' answers to the question cannot be used to show that defendant's actions were below the standard of an ordinarily competent doctor. Therefore, defendant reasons, plaintiff failed to prove that defendant's actions represented more than just an honest error of judgment. Although defendant presents this argument as a separate point on appeal, we find this is no different than the argument discussed in the text, i.e., plaintiff failed to show defendant breached his duty.

8. For his first objection, defendant's counsel stated:
    "Your Honor, I would like to object to that question. It is overly suggestive. It does not fairly represent the facts; he has implied certain things in the record that I believe are unjustified and I would object to the question of this basis."
For his second objection, defendant's counsel stated:
    "Your Honor, I would like to object to that question. It contains misleading information. It also contains or fails to contain certain evidence which has been introduced and is material in this case concerning the condition of the patient as observed by her mother and sister at One O'Clock, which would materially affect the opinion."