Madonna BURNS,
Appellant/Respondent,

v.

ELK RIVER AMBULANCE, INC.,
St. John's Regional Medical
Center, Respondents,

Joplin Emergency Medical Services,
Respondent/Cross–Appellant.

Nos. 23656, 23738.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 18, 2001.

468 

Glenn R. Gulick, Jr. and Edward J. Hershewe, Hershewe & Gulic, P.C., Joplin, for Appellant–Respondent Burns.

M. Douglas Harpool and Michael J. Cordonnier, Daniel, Clampett, Powell & Cunningham, L.L.C., Springfield, for Respondent Elk River Ambulance.

Timothy M. Aylward and Sarah Yehle Fulkerson, Horn, Aylward & Bandy, L.L.C., Kansas City, for Respondent St. John's Regional Medical Center.

William J. Lasley and Peter J. Lasley, Flanigan, Lasley & Moore, LLP, Carthage, for Respondent/Cross–Appellant Joplin Emergency Medical Services.

MONTGOMERY, Judge.

This medical negligence case centers on the death of Clifton Burns (Decedent), an 18–year–old man who suffered a fatal asthma attack. Madonna Burns (Plaintiff), decedent's mother, brought suit against Elk River Ambulance, Inc. (Elk River), a basic life-support ambulance, Joplin Emergency Medical Services (JEMS), an advanced life-support ambulance, and the receiving hospital, St. John's Regional Medical Center of Joplin (St. John's).[1] Plaintiff con-

---

1. Another defendant, City of Sarcoxie, received a directed verdict at the close of the evidence based upon the doctrine of sovereign

tended the defendants were negligent and that their negligence caused the death of her son.

Decedent's death occurred after an asthma attack in Sarcoxie, Missouri. Initially, Decedent was transported by Elk River ambulance from Sarcoxie toward Joplin on Interstate 44. The Elk River ambulance was manned by two Emergency Medical Technicians (EMTs). The EMTs determined en route that decedent was critically ill. They called their dispatcher requesting an "intercept" by an advanced life-support ambulance. JEMS' ambulance, manned by two paramedics, met the Elk River ambulance just west of the Carthage exit on Interstate 44. At this intercept point, JEMS' paramedics administered an Albuterol Sulfate breathing treatment. Eventually, the trip resumed to St. John's with JEMS paramedics on board the Elk River ambulance. One of Plaintiff's witnesses testified that the Elk River ambulance was stopped 15 to 20 minutes at the intercept point. Decedent had stopped breathing upon arrival at the hospital. Although his heart was beating as Decedent was unloaded, his heart stopped beating upon arrival at the emergency room. Decedent was placed on life support systems, but two days later the decision was made to disconnect him. He died shortly thereafter.

The jury returned a verdict finding JEMS 100 percent at fault and awarded Plaintiff $1,000,000 in past noneconomic damages and $500,000 in future noneconomic damages. Pursuant to § 538.210,[2] the statute limiting noneconomic damages, the trial court reduced the award to $528,000, applying the monetary limitations for 2000, the year of the trial, rather than 1995, the year of the death. The trial court ordered that one-third of the $528,000 or $175,824[3] should be attributable to future damages because the jury awarded one-third of the total damages as future noneconomic damages. At JEMS' request, in accordance with § 538.220.2, the trial court then ordered that $55,211.40 of the $175,824 be paid in five equal yearly installments and bear interest at the rate of 6.40 percent per annum. The balance of the judgment, $472,788.60, was denominated as immediately due and payable.

JEMS and Plaintiff appeal. Additional facts are discussed as relevant to each point relied on.

*JEMS' APPEAL No. 23656*

JEMS's first point claims the judgment is void because the trial court lacked subject matter jurisdiction when Plaintiff failed to timely file the affidavit required by § 538.225. JEMS asserts that "the filing of such affidavit is a condition precedent to the trial court assuming jurisdiction over a medical malpractice cause of action."

Initially we note that appellate review is limited to those issues presented in an appellant's points, *Pruellage v. De Seaton Corp.*, 380 S.W.2d 403, 405 (Mo.1964); *Don L. Tullis & Associates, Inc. v. Gover*, 577 S.W.2d 891, 893 (Mo.App.1979), and our opinion on this point should be so viewed.

In its entirety, § 538.225 provides:

1. In any action against a health care provider for damages for personal injury or death on account of the rendering of or failure to render health care services,

---

immunity. No appeal has been taken from that determination.

2. Statutory references are to RSMo 2000 unless otherwise indicated.

3. According to our calculation, one-third of $528,000 is $176,000. Because no one argues with the judgment numbers, we will use the trial court's computations in this opinion.

the plaintiff or his attorney shall file an affidavit with the court stating that he has obtained the written opinion of a legally qualified health care provider which states that the defendant health care provider failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and that such failure to use such reasonable care directly caused or directly contributed to cause the damages claimed in the petition.

2. The affidavit shall state the qualifications of such health care providers to offer such opinion.

3. A separate affidavit shall be filed for each defendant named in the petition.

4. Such affidavit shall be filed no later than ninety days after the filing of the petition unless the court, for good cause shown, orders that such time be extended.

5. If the plaintiff or his attorney fails to file such affidavit the court may, upon motion of any party, dismiss the action against such moving party without prejudice.

Plaintiff filed her petition on November 22, 1996. Neither Plaintiff nor her attorney filed an affidavit as required by § 538.225 within ninety days after the filing date. No request was made to extend the deadline for filing the affidavit. On January 22, 1999, JEMS filed a motion to dismiss Plaintiff's petition without prejudice pursuant to § 538.225.5. The motion was denied on January 26, 1999.[4] Trial commenced on January 10, 2000.

■■■ "The construction of a statute is a question of law." *Staley v. Missouri Director of Revenue*, 623 S.W.2d 246, 248 (Mo. banc 1981). "It is a basic rule of statutory construction that words should be given their plain and ordinary meaning whenever possible." *State ex rel. Maryland Heights Fire Protection Dist. v. Campbell*, 736 S.W.2d 383, 387 (Mo. banc 1987). "Courts look elsewhere for interpretation only when the meaning is ambiguous or would lead to an illogical result defeating the purpose of the legislature." *Id.*

Section 538.225.4 does not require the filing of an affidavit until "no later than ninety days after the filing of the petition." This section also allows the court to extend the filing deadline for good cause shown. Plainly, the statute does not require the affidavit to be filed simultaneously with the petition.

■■■ Subject matter jurisdiction means the authority to determine the general question involved. *Beavers v. Empire District Elec. Co.*, 944 S.W.2d 249, 250 (Mo.App.1997). A court has subject matter jurisdiction if the petition states a claim belonging to the general class of cases over which the court's authority extends. *Id.* Circuit courts have original jurisdiction over all cases and matters, civil and criminal. § 478.070.

■■ In this case, Plaintiff filed her medical negligence case in the Circuit Court of Jasper County, Missouri. It is undisputed that Plaintiff's cause of action falls within the general class of cases over which that court's authority extends. Therefore, the court had subject matter jurisdiction over this case on November 22, 1996, the filing date of Plaintiff's petition. Nothing in the statute suggests that a timely filed affidavit is a "condition precedent" to the court acquiring subject matter jurisdiction over Plaintiff's case nor does the statute suggest that somehow the court loses jurisdic-

---

4. Plaintiff's attorney filed an affidavit on January 23, 1999, without leave of court. The affidavit failed to comply with § 538.225.1, .2, .3, and .4.

tion in the absence of a timely filed affidavit.

JEMS cites no caselaw supporting its point. Our independent research reveals no such authority. JEMS has failed to carry its burden of demonstrating the error of the trial court's judgment. See *Delf v. Cartwright*, 651 S.W.2d 622, 624 (Mo. App.1983). Point denied.[5]

In Point II, JEMS claims trial court error in overruling its motion for new trial because juror Melissa Shaffer failed to disclose in voir dire that her husband Jeffrey Shaffer had been a plaintiff in a medical malpractice case resulting from the wrongful death of his mother. JEMS asserts the trial court's action denied JEMS its right to an impartial panel of twelve jurors under article I, § 22(A), Missouri Constitution.

During voir dire, Melissa Shaffer never disclosed that her husband had been a plaintiff in a medical malpractice case resulting from the death of his mother in June 1988. JEMS had no knowledge of this fact until the trial concluded. Melissa Shaffer was among the nine jurors who joined in the verdict against JEMS.

No evidentiary hearing was held on this issue. Instead, JEMS attached to its suggestions in support the motion for new trial a certified copy of the Shaffers' marriage license showing they married on December 29, 1988, and a certified copy of the medical malpractice petition in which Jeffrey Shaffer was a plaintiff. This suit was filed June 26, 1991.

■■■ The trial court made no findings on this issue in denying the motion for new trial. Based on the record presented, we assume the trial court found that no evidence supported JEMS' claim of intentional nondisclosure.

"The determination of nondisclosure is left to the discretion of the trial judge whose ruling is disturbed only by showing abuse of discretion." *Wingate v. Lester E. Cox Medical Center*, 853 S.W.2d 912, 917 (Mo. banc 1993). The trial court abuses its discretion if its ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.* If reasonable individuals can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *Id.*

*Doyle v. Kennedy Heating and Service, Inc.*, 33 S.W.3d 199, 201 (Mo.App.2000).

■■■ A potential juror's nondisclosure can be intentional or unintentional.

Intentional nondisclosure occurs: 1) where there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and 2) where it develops that the prospective juror actually remembers the experience or that it was of such significance that his purported forgetfulness is unreasonable.

Unintentional nondisclosure exists where ... the experience forgotten was insignificant or remote in time, or where the venireman reasonably misunderstands the question posed.

*Williams by Wilford v. Barnes Hosp.*, 736 S.W.2d 33, 36 (Mo. banc 1987) (citations omitted). However, "[n]ondisclosure occurs only after a party asks a clear question." *Wingate v. Lester E. Cox Medical Center*, 853 S.W.2d 912, 916 (Mo. banc 1993). If a juror truthfully answers the question asked, "he has disclosed every-

---

**5.** Whether a trial court must dismiss a case under chapter 538 where no timely affidavit is filed and no extension of time is granted is a question we leave for future determination.

thing that the voir dire question requires and no nondisclosure of any kind occurred." *Id.* at 916–17.

█ We find nothing in the record showing that Melissa Shaffer was asked a clear question on whether her spouse or a member of her immediate family had ever brought a medical malpractice death claim. JEMS first asserts that the "panel was advised during voir dire that questions asked them were to apply to husbands and other immediate family members." At transcript page 347–48, cited by JEMS, we find the following question by Plaintiff's counsel:

> Ladies and gentlemen, we're going to shift gears and talk about asthma and respiratory issues in this case. And I don't want to pry, but I am going to ask you about your personal experience with that and medicines that you may take. And again, this extends to you, your immediate family and any very close friends. Is there anyone on the panel who has asthma or has a member of their family that has asthma or a close friend that has asthma?

This is a clear question only relating to whether any venireperson, the venireperson's immediate family or friend has asthma. Contrary to JEMS' assertion, the jury panel was not advised that all voir dire questions applied to "husbands."

Next, JEMS states that Melissa Shaffer failed to disclose her husband's claim, "though counsel specifically asked the panel about malpractice cases." At transcript page 505–06, cited by JEMS, Plaintiff's counsel asked this question:

> Thank you. Now I'm going to go to the flip side of it that we talked about. And that is, has anybody on the panel made a claim for personal injury and it doesn't have to be a car wreck. It could be, you know, we've heard various types of injuries on farms and cars and wherever.

> Malpractice medical negligence. Has anybody brought a claim or made a claim where you're contending that someone else caused you injury or caused a death of a member of your family?

This is a clear question only relating to claims brought by any venireperson. The question makes no reference to claims brought by a venireperson's spouse.

Thus, the record does not demonstrate that Melissa Shaffer was ever asked a clear question on whether her spouse had brought a medical malpractice claim. Consequently, no nondisclosure of any kind occurred. We find no abuse of discretion. Point denied.

JEMS' third point complains the trial court erred in submitting Plaintiff's damage definition Instruction No. 14 which "included in the definition of Plaintiff's past non-economic damages 'the pain and suffering of [Decedent]' " because (A) no evidence showed Decedent's pain and suffering was caused by JEMS, (B) the instruction did not limit Plaintiff to recovering only for the pain and suffering caused by JEMS' negligence but gave the jury a roving commission to award damages for any of Decedent's pain and suffering including the asthma attack, and (C) the instruction failed to inform the jury that it must express future damages at present value as required by § 538.215.2 and that Plaintiff failed to present any evidence which would allow the jury to do so.

Initially, we note that this point contains no allegation describing any prejudice suffered by JEMS resulting from this alleged erroneous instruction. Furthermore, we have carefully read JEMS' argument under this point and find no suggestion of how JEMS suffered prejudice resulting from Instruction No. 14.

On appeal, a trial court's ruling on an alleged instruction error is not disturbed absent an abuse of discretion. *Hutson v. BOT Investment Co., Inc.*, 3 S.W.3d 878, 883 (Mo.App.1999). The giving of an alleged erroneous instruction is not grounds for reversal unless the appealing party was prejudiced thereby. *Lear v. Norfolk & Western Ry. Co.*, 815 S.W.2d 12, 15 (Mo.App.1991). "The prejudicial effect of an erroneous instruction must be judicially determined." *Id. See* Rule 70.02(c).[6]

In *Fowler v. Park Corp.*, 673 S.W.2d 749, 757 (Mo. banc 1984), the Supreme Court discussed the consequences of silence by lawyers in the face of an erroneous instruction and observed that "[t]here is a risk that the court will find that the error is not prejudicial so as to require reversal." The Court also said "[r]etrials are burdensome" and "[t]here has been in recent years a trend away from reversal for error in instruction, unless there is a substantial indication of prejudice." *Id.*

Here, there is not only no "substantial indication of prejudice," there is no showing of any prejudice at all. Therefore, even if Instruction No. 14 is erroneous, we do not reverse in the absence of a showing of prejudice. The trial court rejected these claims in JEMS' motion for new trial. We find no abuse of trial court discretion and deny Point III.

The first paragraph of JEMS' fourth point reads as follows:

> The trial court erred in submitting Plaintiff's verdict instruction (# 8) against JEMS, which instruction hypothesized that JEMS did not: transport [Decedent] "in a timely manner" or "timely establish and maintain an adequate airway", or "timely establish and maintain adequate ventilation of [Dece-

dent]", or that Mike Wilson "assessed [Decedent] as being in mild respiratory distress", or "JEMS did not administer Epinephrine", and that such negligence caused [Decedent's] death, because, contrary to Civil Rule 70.02, *the instruction did not submit simple ultimate facts free and impartial of argument* in that:

(Emphasis added.)

Following this paragraph, JEMS sets forth five subparagraphs asserting:

> A. The above charges of negligence, except failure to administer Epinephrine, were so "general and vague" the jury was given a roving commission to roam through the evidence and choose any facts subjecting JEMS to liability.

> B. The phrases "timely transport," "timely establish and maintain an adequate airway" and "timely establish and maintain ventilation" were not defined, were terms of art not commonly understood by laymen, required specialized medical expertise to understand and apply and as such, gave the jury a roving commission.

> C. The submission of "failed to transport ... in a timely manner" was unsupported by any evidence demonstrating how much time would have been saved if Decedent had been transported as urged by Plaintiff.

> D. There was no factual foundation to establish that JEMS should be charged with "not administering Epinephrine" because JEMS was forbidden from giving this drug absent a doctor's order which it did not have. "Additionally, said charge was not pleaded."

> E. The instruction submitted four allegations of general negligence along with the specific allegation of negligence—did not administer Epineph-

---

**6.** Rule references are to Missouri Court Rules (2001) unless otherwise mentioned.

rine—which failed to confine the jury to factual issues and permitted the jury to speculate in the nature of a roving commission.[7]

As can readily be seen, this point attempts to set out multiple claims of error. Plaintiff assails the point as preserving nothing for our review pointing to its violation of Rule 84.04 by stating five contentions of error not related to a single issue.

■■■■■ "Any point relied on for appellate review of alleged error should definitely formulate and isolate the exact issues to be reviewed." *Biever v. Williams,* 755 S.W.2d 291, 293 (Mo.App.1988). "A statement of a point relied on also violates Rule 84.04 when it groups together contentions not related to a single issue." *Id.* See *Thummel v. King,* 570 S.W.2d 679, 688 (Mo. banc 1978). Improper points relied on preserve nothing for appellate review. *Skalecki v. Small,* 976 S.W.2d 566, 568 (Mo.App.1998).

■■■■■ Here, the first paragraph of JEMS' point plainly alleges the trial court erred in submitting Instruction No. 8 "because" the instruction failed to submit "ultimate facts," in violation of "Civil Rule 70.02." As applicable to this allegation, Rule 70.02(b) provides that "where there is no applicable MAI," then a modified or not in MAI instruction "shall be simple, brief, impartial, free from argument," and shall not submit "detailed evidentiary facts." "A proper instruction submits to the jury only ultimate issues, not evidentiary details." *Sheinbein v. First Boston Corp.,* 670 S.W.2d 872, 878 (Mo.App.1984). "This is done to avoid undue emphasis of certain evidence, confusion and favoring one party over another." *Id.*

■■■■■ Subparagraphs A and B claim that Plaintiff's submissions of negligence are "general and vague," are "undefined" and not commonly understood by laymen. These allegations attempt to explain why Instruction No. 8 did not submit ultimate facts defining Plaintiff's theory of negligence. However, subparagraphs C and D essentially claim that certain of Plaintiff's submissions of negligence are unsupported by the evidence. The last subparagraph complains that the instruction mixed four allegations of general negligence with one allegation of specific negligence. We fail to see how subparagraphs C, D, and E relate to JEMS' only claim of trial court error, i.e., failure to submit ultimate facts. Thus, Plaintiff properly asserts that this point groups multiple contentions not related to a single issue.

In our view, this point does not violate Rule 84.04 as it relates to JEMS' claim of

---

7. Instruction No. 8 reads as follows:

In your verdict you must assess a percentage of fault to defendant JEMS whether or not [Decedent] was partly at fault if you believe:

First either:

Defendant JEMS did not transport [Decedent] in a timely manner, or

Defendant JEMS did not timely establish and maintain an adequate airway, or

Defendant JEMS did not timely establish and maintain adequate ventilation of [Decedent], or

Defendant JEMS' paramedic Mike Wilson assessed [Decedent] as being in mild respiratory distress, or

Defendant JEMS did not administer epinephrine, and

Second, Defendant JEMS, in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause the death of [Decedent].

The term "negligent" or "negligence" as used in these instructions means the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of defendant JEMS' profession.

trial court error set forth in the first paragraph and subparagraphs A and B. Therefore, we address those issues. However, we do not address subparagraphs C, D, and E because no claim of trial court error is raised regarding the issues therein.

 Whether jury instructions are confusing or misleading is initially left to the trial court's discretion. *Hutson,* 3 S.W.3d at 883. On review, the trial court's ruling will not be disturbed absent a showing of abuse of discretion. *Id.* In deciding if an abuse of discretion has occurred, the reviewing court "is permitted to believe that the jury was composed of reasonably intelligent people who possess common sense and an average understanding of the English language." *Affiliated Foods, Inc. v. Strautman,* 656 S.W.2d 753, 758–59 (Mo.App.1983).

All three of Plaintiff's expert witnesses testified that JEMS should have administered "bag valve mask ventilation" before Decedent's sudden deterioration just prior to arriving at St. John's. Dr. Bennoch, one of Plaintiff's experts, testified that Decedent's asthma attack produced air hunger. His testimony emphasized that oxygen must "go down to these little air sacs" so "if you don't get oxygen down there, he dies." Dr. Bennoch stated "[JEMS] didn't get oxygen down there and he died. [JEMS] didn't get enough oxygen down there, and they didn't do it the right way."

 Plaintiff presented evidence which allowed the jury to believe that the trip to St. John's Hospital lasted almost eighteen minutes longer than necessary, and the delay was caused by JEMS at the intercept point. Other evidence suggested that JEMS failed to require the ambulance to drive faster and take the proper route when Decedent was in severe respiratory distress as opposed to mild respiratory distress. St. John's emergency room phy-

sician testified that if Decedent had arrived earlier at the hospital, he would have had a "conscious breathing patient versus a comatose patient in full cardiac arrest."

"There are no 'precise, universally applicable definitions which explicitly differentiate evidentiary facts from ultimate facts.'" *Duncan v. First State Bank of Joplin,* 848 S.W.2d 566, 569 (Mo.App.1993) (*quoting L.S. Douglas v. Hoeh,* 595 S.W.2d 434, 438 (Mo.App. 1980)). Courts must determine, therefore, what the ultimate facts are on a case-by-case basis. *Duncan,* 848 S.W.2d at 569. This determination involves analysis of the specific theory relied on by the party offering the instruction. *Id.; Grindstaff v. Tygett,* 655 S.W.2d 70, 73 (Mo.App.1983).

*Stalcup v. Orthotic & Prosthetic Lab, Inc.,* 989 S.W.2d 654, 658 (Mo.App.1999).

Here, Plaintiff's theories of negligence were that JEMS did not transport Decedent to St. John's Hospital in time to allow life saving treatment, did not establish and maintain an adequate airway and ventilate Decedent to allow enough oxygen in the lungs, that Decedent was misdiagnosed as in respiratory distress when he was in severe respiratory distress and that JEMS did not administer Epineprine, a drug to aid breathing.

JEMS claims that "establishing a proper airway" is confusing because it does not necessarily refer to a procedure or insertion of an artificial device. JEMS also suggests that "timely" and "adequate" requires the jury to possess medical expertise to determine if JEMS performed its job correctly.

 As noted, in reviewing jury instructions, we must credit jurors with ordinary intelligence, common sense, and average understanding of the English language. We are not convinced that "ade-

quate airway or ventilation" are scientific words requiring expert testimony to define for the jury. We do not believe those are words compelling the jury to employ medical expertise which it does not have. To a reasonable juror, those words, as applied to the evidence in this case, simply ask whether JEMS failed to "get oxygen down there" in Decedent's lungs. The same can be said for the phrase "timely transport." Plaintiff's evidence asked the jury to determine whether Decedent could have been saved if JEMS had required the ambulance to leave the intercept point without delay and drive faster to the hospital in a direct route.

In *Kampe v. Colom*, 906 S.W.2d 796 (Mo.App.1995), plaintiff was awarded damages against the defendant doctor. On appeal, the doctor claimed the verdict-directing instruction was *inter alia* misleading and confusing. The jury was instructed to find for plaintiff if it believed the doctor "failed to monitor the medications he prescribed for [plaintiff]." *Id.* at 803. The appellate court determined the instruction sufficiently submitted the ultimate facts which defined for the jury the plaintiff's specific theory of negligence. *Id.* at 805. The court reasoned that the word "monitor" was not a scientific word that expert testimony should define to aid the jury and did not compel the jury to employ expertise it lacked. *Id.* The court explained that to a reasonable person the term "monitor" as applied to the evidence in the case, asked whether the doctor observed, oversaw, supervised, or regulated the plaintiff's use of the prescribed medications. *Id.* Finally, the court said the exact method by which the doctor could have "observed, overseen, supervised or regulated" the amount of medicine prescribed and ingested by plaintiff need not be determined by the jury. *Id.*

The term "monitor" in *Kampe* is similar to "adequate airway and ventilation" and "timely transport" in this case. The latter terms are not more scientific than "monitor" nor do the words need expert testimony to define them for the jury. Finally, as in *Kampe*, the exact method by which JEMS could have maintained an adequate "airway," "ventilated and transported Decedent" was unnecessary for the jury to determine.

JEMS mainly relies on *Grindstaff v. Tygett*, 655 S.W.2d 70, 72 (Mo.App.1983), a medical malpractice case where plaintiff's verdict-directing instruction was claimed to be prejudicially erroneous, ambiguous, and allowed the jury a roving commission to determine what the instruction meant. The jury was instructed to find for plaintiff if it believed "defendant performed a midforceps rotation delivery when such procedure was not medically proper." *Id.* The appellate court determined the phrase "not medically proper" failed to submit the ultimate facts which defined the specific theory of negligence. *Id.* at 73. The court noted that plaintiff's negligence theories were based on expert testimony and that the experts defined the conditions under which the procedure of a midforceps rotation delivery is proper and the conditions under which it is improper. *Id.* The court reasoned that the instruction could have been interpreted a number of ways by the jury, thus giving it a "roving commission" to speculate and determine on its own why and in what manner the procedure was "not medically proper." *Id.* at 74.

The present case is distinguishable from *Grindstaff*. The verdict instruction in this case submitted ultimate facts which defined for the jury Plaintiff's specific theory of negligence. The instruction in *Grindstaff* required the jury to speculate and utilize medical expertise that it did not

possess and required the jury to determine that uncertain professional conduct was not medically proper. Those defects do not exist in this case. Point IV is denied.

JEMS' Point V alleges the trial court erred in allowing Plaintiff's expert witnesses Dr. Larson and Dr. Nichols to testify concerning the standard of care which should be used by a paramedic because these doctors were not qualified in the field of paramedic treatment or transport.

JEMS' two pages of argument under this point makes no effort to show how it was prejudiced from the admission of the doctors' testimony. Even if the trial court abused its discretion in admitting this testimony, we do not reverse in the absence of a showing of prejudice. *Gage v. Morse*, 933 S.W.2d 410, 420–21 (Mo.App.1996). Rule 84.13(b) provides that this Court shall not reverse the judgment unless we find that the trial court error materially affected the merits of the case.

JEMS has failed to show the alleged error materially affected the outcome of this case by describing no prejudice. The appealing party has the burden to demonstrate error. *Cartwright*, 651 S.W.2d at 624. JEMS has failed to carry its burden on this point. It is denied.[8]

### Plaintiff's Appeal No. 23738

Plaintiff raises five claims of trial court error on appeal. In her first two points, Plaintiff's allegations of error are based upon the trial court's failure to admit certain evidence. The admission or exclusion of evidence lies within the sound discretion of the trial court and will not be the basis for reversal absent abuse of discretion. *Nelson v. Waxman*, 9 S.W.3d 601, 603 (Mo. banc 2000). We will find

such an abuse of discretion only where the trial court's ruling is clearly against the logic of the circumstances then before it and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration. *Id.* at 604.

The appellant bears the burden of establishing an abuse of discretion. *Aliff v. Cody*, 26 S.W.3d 309, 315 (Mo.App. 2000). "The focus is not on whether the evidence was admissible but on whether the trial court abused its discretion in excluding the evidence." *Id.* at 314. We will uphold the trial court's ruling when any recognizable ground exists on which the trial court could have rejected the evidence. *Id.* at 315. Furthermore, in instances where the trial court's failure to admit evidence was erroneous, such error does not mandate a reversal unless the error materially affected the merits of the action resulting in substantial or glaring injustice. *Id.*

In Point I, Plaintiff maintains the trial court erred in sustaining St. John's' objection to the testimony of Plaintiff's expert, Dr. Nichols, concerning his opinion as to whether St. John's was at fault for failing to provide direct supervision of the emergency personnel in the ambulance. Plaintiff contends that the testimony should not have been excluded because it was not new or different from the testimony offered during Dr. Nichols' deposition. She argues that she was prejudiced by the exclusion of Dr. Nichols' testimony because it was the only evidence that would have established that St. John's violated the appropriate standard of care in providing medical advice to the ambulance.

During cross-examination, Plaintiff's counsel asked Dr. Nichols about the man-

---

8. JEMS presents two more points for our decision if a new trial is granted or the judg- ment is amended. Because the judgment is affirmed, we need not address these points.

agement of Decedent's care in the field and protocols concerning that care. Dr. Nichols began his answer by stating this was an area of confusion but that a St. John's doctor had indicated he believed he was managing Decedent's care. Counsel for St. John's interrupted the testimony and objected to the line of questioning based upon surprise. St. John's claimed that any testimony by Dr. Nichols suggesting St. John's was responsible for managing the patient's care and had violated the standard of care would be in direct conflict with Dr. Nichols' prior deposition testimony in which he stated he could not form an opinion as to that issue.

Plaintiff's counsel argued that in his deposition Dr. Nichols did state an opinion as to whether or not St. John's violated the standard of care in managing Decedent's field care. Plaintiff's counsel cited the trial court to the following exchange during Dr. Nichol's deposition testimony:

Counsel: Do you have an opinion as to St. John's whether or not they violated the standard of care?

Dr. Nichols: I wrestled with that issue. I did not put it down here. Part of the answer to that question really depends on what the standard practice and expectation for management and consultation of critically ill patients in the field was in this community and in the relationship between St. John's and JEMS and Sarcoxie. If it was considered standard protocol and usual procedure for the physicians at St. John's to render medical opinions and provide supervision and direction to these emergency medical companies and ambulance companies, then I would indicate that the St. John's emergency physicians were not appropriately focused on this critically ill patient and did not provide direct management and supervision.

If, on the other hand, the nature of the relationship was more one in which the ambulance companies had preexisting protocols and telephone in their assessment with the expectation that the physicians would just rubber stamp or approve what their ongoing management was supposed to be and that the nature of the call was merely to alert the hospital that a patient was coming in with such and such a diagnosis, that is a much looser type of relationship, then I would not fault the physicians in this case. Under those circumstances I would believe that greater failure was in the, particularly the JEMS paramedics in not communicating the urgency and the severity of the attack that Clifton Burns was suffering. So it depends on the bottom line.

Plaintiff maintains this testimony established that at the time of his deposition, Dr. Nichols did have the opinion that St. John's personnel fell below the standard of care based upon the first of the alternative relationships St. John's had with the ambulance companies. Plaintiff further claims this testimony precluded any claim at trial of unfair surprise by St. John's. This, however, was not the end of Dr. Nichols' deposition testimony.

Further along in the deposition, counsel asked Dr. Nichols if he was prepared at trial to form an opinion and to testify within a reasonable degree of medical certainty as to whether St. John's violated the standard of care in the case. Dr. Nichols replied, "Not with the evidence I have in front of me right now. It's too conflicting." The following exchange then took place:

Counsel: [You] have not formed any opinions in this case that anything done by the personnel at St. John's Regional Medical Center violated the standard of care; is that correct?

Dr. Nichols: I have not been able to reach such a conclusion.

. . .

Counsel: Having had all of those experiences in your own life, you were not able to reach any conclusion or you did not reach any conclusion in this case that anything that the personnel at St. John's did fell below the standard of care?

Dr. Nichols: I have not reached such a conclusion because I lack some information and that is what the precise nature of the relationship is between St. John's and the various emergency providers.

. . .

Counsel: And you simply do not hold any opinion to a reasonable degree of certainty that anything that the people at the hospital did was below the standard of care?

Dr. Nichols: Not at this time.

Based upon these portions of Dr. Nichols' deposition, the trial court determined:

I'm going to sustain the objection. I think that it's pretty clear [in the deposition] that he has no opinion, to a reasonable degree of certainty, that anything that the people at the hospital did was below the standard of care.

He said, "Not at this time." That's a very clear statement. It doesn't have any hypotheticals in it. It doesn't ask him to assume anything. It's pretty clear.

The decision to exclude this testimony is not erroneous. As noted, the decision to admit or exclude evidence, including expert testimony, is a matter of trial court discretion. *Fierstein v. DePaul Health Ctr.*, 24 S.W.3d 220, 226 (Mo.App. 2000). "A witness should not be allowed to testify about things in which the witness indulges in mere speculation, guess and conclusions." *Fairbanks v. Weitzman,* 13 S.W.3d 313, 318 (Mo.App.2000). Furthermore, this Court rarely convicts a trial court of reversible error by mere exclusion of expert testimony, even if such testimony is relevant and admissible. *Bella v. Turner,* 30 S.W.3d 892, 896 (Mo.App.2000).

At the time of Dr. Nichols' deposition, he admitted he did not have enough information to make the determination that St. John's personnel fell below the standard of care when managing Decedent's care in the field. The trial court merely sustained the objection to any trial testimony that was contrary to the position Dr. Nichols took in the deposition. Dr. Nichols was allowed to testify to all other issues. The exclusion of Dr. Nichols' testimony on this issue does not amount to "substantial or glaring injustice." *Aliff,* 26 S.W.3d at 315. Point I is denied.

In her second point, Plaintiff claims the trial court erred in sustaining Elk River's objection to Plaintiff's offer of Exhibit 72–2, the portion of the bill for Elk River's services that included a charge for a non-rebreather mask. Plaintiff maintains the contents of the bill contradicted Elk River's contention that its ambulance attendants used a bag-valve mask with oral airway the entire time Decedent was in their care. Plaintiff acknowledges that she was allowed to present oral evidence concerning the bill's contents but argues that the trial court's failure to allow "documentary evidence" substantially reduced its effectiveness. We disagree.

One of the issues at trial was the appropriate standard of care for Elk River's EMTs in aiding Decedent's breathing from the time they picked him up until they reached the intercept point. There was testimony concerning the differences be-

tween a non-rebreather mask and a bag-valve mask, and which mask would have been more appropriate to use for a patient in Decedent's condition. The evidence suggested a bag-valve mask would have been necessary for Decedent to receive an adequate supply of oxygen.

Jason White, an expert witness for Elk River, testified that he believed the EMTs had used a bag-valve breather the entire time prior to the intercept. He testified on direct examination that he did not believe the EMTs used a non-rebreather bag. During cross-examination, Plaintiff's counsel asked Mr. White if the EMTs used a non-rebreather mask and pointed out that Elk River charged for such a mask in its bill. Mr. White reiterated that he did not think Elk River's EMTs ever used a non-rebreather mask prior to the intercept point.

After Elk River rested, Plaintiff offered into evidence Exhibit 72–2, the second page of Elk River's bill. Elk River objected. After a lengthy discussion on the matter, the trial court refused to admit the bill but allowed Plaintiff to call Eric Harris, the owner of Elk River, to testify that the company had charged for a non-rebreather mask in its bill. Plaintiff argues she was prejudiced by the court's decision to allow testimony on the issue in lieu of admitting the bill as an exhibit because "[j]uries ... have a preference for documents."

■■■■ As noted, the trial court's broad discretion in admitting and excluding evidence is given substantial deference on appeal. " 'Balancing the effect and value of evidence is within the trial court's sound discretion.' " *State v. Mathews*, 33 S.W.3d 658, 661 (Mo.App.2000) (quoting

*State v. Wayman*, 926 S.W.2d 900, 905 (Mo.App.1996)). Generally, a trial court may exclude cumulative evidence. *See Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47, 72 (Mo. banc 1999); *Destin v. Sears, Roebuck and Co.*, 803 S.W.2d 113, 116 (Mo.App.1990). Cumulative evidence "is defined as 'additional evidence of the same kind bearing upon the same point.' " *Thoroughbred Ford, Inc. v. Ford Motor Co.*, 908 S.W.2d 719, 737 (Mo.App.1995) (quoting *Mobley v. Webster Elec. Coop.*, 859 S.W.2d 923, 933 (Mo.App.1993)).

■■■■ In the instant case, the trial court permitted Plaintiff to call Mr. Harris to testify in rebuttal to Mr. White's testimony that the EMTs had not used a non-rebreather mask prior to the intercept point. Plaintiff questioned Mr. Harris concerning the contents of the bill, and Mr. Harris testified that it indicated the company had charged for the use of a non-rebreather mask. Accordingly, the trial court could have considered the excluded copy of the bill as "additional evidence of the same kind bearing upon the same point." Even if this court were to conclude that it was error to refuse to admit the bill, the duplicative nature of evidence otherwise before the trial court by reason of Mr. Harris' testimony would defeat any claim of prejudice. *See Francka v. Francka*, 951 S.W.2d 685, 694 (Mo.App.1997).

Based upon the degree of deference given to such matters of discretion, we cannot say the trial court erred in excluding the Elk River bill from evidence. Point II is denied.

■■■■ In Point III, Plaintiff contends the trial court misapplied § 538.210,[9] the statutory limitation on noneconomic damages,

---

9. Section 538.210.1 provides:

In any action against a health care provider for damages for personal injury or death arising out of the rendering of or the failure to render health care services, no plaintiff shall recover more than three hundred fifty thousand dollars per occurrence for noneconomic damages from any one defendant.

by apportioning the limitation between past damages and future damages in percentages commensurate with the jury award. Plaintiff claims she was prejudiced by this decision because under § 538.220.1 past damages must be paid in a lump sum while § 538.220.2 allows for future damages to be paid in whole or in part in periodic or installment payments. Plaintiff urges that the trial court should have ignored the allocations made by the jury and instead applied the limitation to past noneconomic damages first. She argues the trial court should have allowed installment payments of future noneconomic damages only if a balance remained after the allocation of past noneconomic damages.

In the instant case, the jury returned a verdict in favor of Plaintiff for the amount of $1,500,000 in noneconomic damages, assessing 100 percent of fault to JEMS. The jury designated $1,000,000 or two-thirds of the total award for past noneconomic damages and $500,000 or one-third of the total award for future noneconomic damages. Pursuant to §§ 538.210.1 and 4, the trial court reduced the total award to $528,000 based upon the monetary limitation in effect for the year 2000.

Using the percentages assigned by the jury, the trial court apportioned two-thirds of the $528,000 total or $352,176 for past noneconomic damages and the remaining one-third or $175,824 for future noneconomic damages. In accordance with § 538.220.2, the trial court ordered that $55,211.40 of the $175,824 for future damages be paid in five equal yearly installments with interest at the rate of 6.40 percent per annum. The balance of the judgment, $472,788.60, was designated as immediately due and payable.

Plaintiff argues that this allocation of the limitation "rewards Defendants for causing substantial future noneconomic damages" by allowing them avoid a lump sum payment of the entire amount under the statutory limit. The statutes are silent as to how the trial court should apportion the limit between past and future noneconomic damages. We are called upon to make this determination.

Statutory construction is a question of law, not judicial discretion. *Eckenrode v. Director of Revenue*, 994 S.W.2d 583, 585 (Mo.App.1999). "The primary rule of statutory interpretation requires this Court to ascertain the intent of the legislature by considering the language used while giving the words used in the statute their plain and ordinary meaning." *Benoit v. Missouri Highway and Transp. Comm'n*, 33 S.W.3d 663, 673 (Mo.App. 2000). Furthermore, we presume the General Assembly intended what the statute says; therefore, when the legislative intent is apparent from the words used and no ambiguity exists, there is no room for construction. *Eckenrode*, 994 S.W.2d at 586.

According to § 538.215.1, in any action against a health care provider for damages for personal injury or death arising out of the rendering or failure to render health care services, the trier of fact shall designate any damages as 1) past economic damages; 2) past noneconomic damages; 3) future medical damages; 4) future economic damages, excluding future medical damages; and 5) future noneconomic damages. The statute further states that the court shall reduce any award of noneconomic damages in excess of the limit to the maximum amount. § 538.215.3.

Both of these sections use the term "shall." "The use of the word 'shall' in a statute is generally interpreted as mandatory." *See Hutchison v. Cannon*, 29 S.W.3d 844, 847 (Mo.App.2000); *Allen v. Public Water Supply Dist. No. 5 of*

*Jefferson County,* 7 S.W.3d 537, 540 (Mo. App.1999). It would be absurd for the legislature to mandate that the trier of fact individually itemize past noneconomic damages and future noneconomic damages and then mandate the trial court to ignore these allocations when reducing the noneconomic damages to meet the limit. Such an interpretation would nullify the determination of the trier of fact. We must avoid statutory interpretations that are unjust, absurd or unreasonable. *Benoit,* 33 S.W.3d at 673.

■ In addition, we consider a statute in the context of the entire statutory scheme on the same subject in order to determine legislative intent. *Id.* at 673–74. The legislature decided to allow a defendant to pay future noneconomic damages in installment payments rather than a lump sum. § 538.220.2 The legislature also decided to require the trier of fact to itemize damages into various categories. Based on this statutory scheme, the legislature does not hint that defendants should pay the entire award below the limit in a lump sum without regard to the jury's itemization of damages.

Finally, we must note that the trial court required JEMS to pay the vast majority of the award, $472,788.60, in a lump sum. Only $55,211.40 was ordered to be paid in annual installments. Plaintiff suffered no undue hardship from the trial court's allocation. Point III is denied.

■ Plaintiff alleges in Point IV the trial court erred in applying only one monetary limit (cap) for noneconomic damages per § 538.210.1 because there were two persons entitled to recover for the wrongful death of Decedent. Plaintiff states she brought the wrongful death suit on behalf of herself and Decedent's father, and "therefore two 'caps' should have been applied."

As Decedent's mother, Plaintiff brought this wrongful death action. Decedent's father was never a party to the action. Section 537.095.1, in pertinent part, states that "if two or more persons are entitled to sue for and recover damages ... then any one or more of them ... may maintain such suit and recover such damages without joinder therein by any other person, provided that the claimant or petitioner shall satisfy the court that he has diligently attempted to notify all parties having a cause of action under 537.080." Decedent's father had "the right to intervene at any time before any judgment" was entered in this case. § 537.095.2. However, the record shows no such effort on his part.

Section 538.210 provides that "no plaintiff shall recover more than three hundred fifty thousand dollars per occurrence for noneconomic damages from any one defendant." This cap changes annually and is tied to "the Implicit Price Deflator for Personal Consumption Expenditures as published by the Bureau of Economic Analysis of the United States Department of Commerce." § 538.210.4. The trial court applied the cap of $528,000 indicated for the year of 2000.

Plaintiff argues that "[h]ad the legislature intended for one cap to apply irrespective of the number of derivative claims, it could and would have clearly indicated that a single cap was to be applied to all claims that flowed from negligent acts committed upon one patient." This argument requires us to determine the legislature's intent in adopting various provisions of chapter 538.

In *Mahoney v. Doerhoff Surgical Services,* 807 S.W.2d 503, 507 (Mo. banc 1991), the Supreme Court stated that "[i]t is readily understood from the history and text of *Chapter 538* that the enactment is a legislative response to the public concern

over the increased cost of health care and the continued integrity of that system of essential services." Later, the Supreme Court again discussed the legislature's intent in enacting chapter 538 in *Budding v. SSM Healthcare System*, 19 S.W.3d 678 (Mo. banc 2000). There, the Court said:

> The Court's role in interpreting these statutes is to "ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words used in their plain and ordinary meaning." In determining the legislature's intent in adopting the various provisions of chapter 538, several conclusions are obvious.... Third, the legislature intended to impose specific limitations on the traditional tort causes of action available against a health care provider. Included in these limitations is ... a cap on noneconomic damages, sec. 538.210, and structured settlements of future damages, sec. 538.220.

*Id.* at 680 (citations omitted).

■ *Mahoney* and *Budding* reveal that the legislature intended to impose "specific limitations" on tort claims against health care providers including caps on noneconomic damage in order to temper the high cost of health care. When the legislature directed that "no plaintiff shall recover more than" a limited amount per occurrence for noneconomic damages, the language is plain and unambiguous. "[W]hen the language of the statute is unambiguous and conveys a plain and definite meaning, 'the courts have no business foraging among such rules [of construction] to look for or impose another meaning.'" *Matter of Estate of Thomas*, 743 S.W.2d 74, 76 (Mo. banc 1988) (citing *DePoortere v. Commercial Credit Corp.*, 500 S.W.2d 724, 727 (Mo.App.1973)).

■ We must presume that "the legislature acts with the knowledge of statutes involving similar or related subject matters." *Allen*, 7 S.W.3d at 540. When chapter 538 was enacted, the legislature knew that any one plaintiff could sue and recover damages for a wrongful death under § 537.095.1. The legislature also knew that a recovery by any one plaintiff could be apportioned by the court according to the losses suffered by each person entitled to share in the proceeds under § 537.095.2. Certainly the legislature knew that an action for wrongful death could be brought against a health care provider as defined in chapter 538. Even so, the legislature did not make provisions for increasing the cap where a lone plaintiff's recovery could be apportioned among persons not parties.

■ We also must presume the legislature is aware of the state of the law at the time it enacts a statute. *Martinez v. State*, 24 S.W.3d 10, 17 (Mo.App.2000). Long before the enactment of chapter 538 the Supreme Court of this state said "[t]he wrongful death statute creates but one indivisible cause of action which remains the same whether enforceable by the surviving spouse, by the minor child or children, or by the others named in the statute." *Nelms v. Bright*, 299 S.W.2d 483, 487 (Mo. banc 1957). The legislature, armed with knowledge that the wrongful death statute created an indivisible cause of action enforceable by one or more persons, chose not to make provisions for increasing the cap where only one plaintiff recovered and others could share in the recovery. Therefore, the legislature enacted chapter 538 with knowledge of the wrongful death statutes and the Supreme Court's interpretation of § 537.080 identifying those persons entitled to sue and those persons entitled to share in the recovery for a wrongful death.

If Plaintiff's argument is accepted, a widow could sue for her husband's wrong-

ful death and recover a separate cap for herself and each of the couple's six children. This interpretation does not further the legislative goal of harnessing increasing health care costs nor does it square with the legislature's awareness of the application of § 537.080 when chapter 538 was enacted. By using the words "no plaintiff shall recover more than" a limited amount, we believe the legislature intended to avoid multiple caps even if derivative claims are involved. Otherwise, the legislature could have made provisions in § 538.210.1 for the very situation existing in this case. Point IV lacks merit.

In Point V, Plaintiff asserts a constitutional challenge to §§ 538.210 and 538.220, claiming that application of these statutes "violate the equal rights clause of Art. I, § 2 of the Missouri Constitution, the due process clause of Art. I, § 10 of the Missouri Constitution, and the open courts provision of Art. I, § 14 of the Missouri Constitution."

Plaintiff recognizes this Court is bound by *Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898 (Mo. banc 1992), which ruled adversely on the precise issue Plaintiff raises. However, Plaintiff suggests that this case may eventually be heard by the Supreme Court and desires to preserve the issue.

The Supreme Court of Missouri has exclusive appellate jurisdiction in all cases involving the validity of the statutes of this state. Mo. Const. art. V, § 3. If Plaintiff's constitutional attack on these statutes was an open question, this Court would have no jurisdiction to decide the case. However, once the Supreme Court has ruled on the precise issue presented, this Court has jurisdiction to proceed. *State v. Holley*, 488 S.W.2d 925, 927 (Mo. App.1972). In these circumstances, this Court is only involved in a question of "constitutional application rather than con-

stitutional construction." *Id.* When the Supreme Court has settled the legal doctrine, this Court can apply it to the facts at hand. *Id. See State ex rel. Bonham v. Bonebrake*, 577 S.W.2d 430, 431 (Mo.App. 1979). Application of the law as pronounced in *Adams*, which Plaintiff recognizes, requires that we deny this point.

The judgment is affirmed.

SHRUM, P.J., and BARNEY, C.J., concur.